[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 7, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-13014
Non-Argument Calendar

_____

BIA Nos. A95-903-978 & A97-194-337

LINA MARIA MONCADA-RUBIO,
MARIA ALEYDA RUBIO-FRANCO,
SILVIO MONCADA-MARIN,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(February 7, 2008)**

Before BIRCH, DUBINA and KRAVITCH, Circuit Judges.

PER CURIAM:

Lina Maria Moncada-Rubio ("Rubio") arrived in the United States on a non-

immigrant student visa in 1999, and, when she did not attend classes, she received a notice to appear charging her with removability under INA § 237(a)(1)(C)(i); 8 U.S.C. § 1227(a)(1)(C)(i). Rubio's parents Maria Rubio-Franco ("Franco") and Silvo Moncada Marin ("Marin"), arrived in the United States in 2001 on non-immigrant visas, remained beyond the expiration period, and were charged with removability under INA § 237(a)(1)(B); 8 U.S.C. § 1227(a)(1)(B). Rubio and Franco applied for asylum in 2005; Marin proceeded as a derivative beneficiary on Franco's petition.[1] The applications were consolidated.

At the removal hearing, the IJ first questioned the timeliness of the asylum applications because the petitioners entered in 1999 and 2001, but did not file until 2002.[2] Rubio explained that she had sought assistance with the application from a religious organization, but that the attorney helping her stole her money and never filed the application. Rubio admitted, however, that she never contacted police about the theft, nor did she file a complaint with the state bar association.

Addressing the merits of the application, Rubio testified as follows: She had been born in Colombia and attended the university there until she was forced to

---

[1] Rubio claimed persecution on account of her political opinion. Franco alleged persecution based on religion.

[2] Rubio testified that she filed the original application in 2002, but that the attorney who assisted her stole the money and never filed the application. The application submitted with the record is dated 2005. In the 2002 application, Rubio did not mention the threats and kidnaping attempt. According to Rubio, this information was omitted because the application was prepared by the attorney who later stole her money.

leave the country. Her mother worked as a counselor, visiting neighborhoods and preaching to drug addicts and couples seeking divorce. Her father was a member of the Civil Police, which was a volunteer arm of the National Police and which conducted surveillance and intelligence work. In 1999, while at the university, some friends tried to recruit her to work with FARC because of her father's access to intelligence information. Rubio was not interested, but the friend warned her that she must join or die. In mid-October, members of FARC chased Rubio by car in an attempt to kidnap her. Rubio drove to her boyfriend's house and rammed her car into the garage to get attention.[3] Thereafter, Rubio received phone calls seeking coded intelligence such as planned roadblocks and information on various people. Frightened, Rubio fled to the United States. Although she informed her father of the threats, she did not file a police report.

In December 2000, FARC attempted to kidnap Rubio's younger sister Paula from Franco's clothing boutique. An employee interrupted the kidnaping, screamed for help, and the FARC members ran as security arrived. Paula left Colombia in January 2001. Shortly thereafter, Franco was shot in the leg by a man on a motorcycle. Rubio's sister Sandra, who was a physician, treated the wound, and Franco did not report the attack. Franco went to Bogota to hide, but FARC

---

[3] In her asylum application Rubio indicated that she had driven to the police station to avoid FARC. On cross-examination she confirmed that she had driven to her boyfriend's home.

members found her, and Franco received a threatening phone call while in Bogota. Rubio admitted that the situation in Colombia had improved since the new president came to power, but she nevertheless feared she would be killed if she returned.

In support of the applications, the petitioners submitted the Department of State Profile on Colombia and the 2004 Country Report. Although both reports addressed FARC's presence and violent tendencies, neither referenced any of the incidents of which Rubio or Franco alleged. Moreover, the reports indicated that the situation in Colombia had improved.

The IJ denied relief, finding first that the asylum application was untimely and that there were no exceptional circumstances to excuse the untimely application. The IJ then concluded that Rubio was not eligible for relief because she was not a member of a protected group, and there were changed circumstances in Colombia. The IJ noted that there was no corroborating evidence of the shooting or other alleged incidents.

Rubio appealed to the BIA. While the appeal was pending, Rubio moved to remand to add new evidence in the form of letters from Franco and Rubio's church, confirming that FARC made threatening phone calls after Rubio left Colombia. The BIA adopted and affirmed the IJ's decision with additional comments and denied the motion to remand. Rubio now petitions this court for

4

review, arguing that the BIA erred by (a) concluding that the family did not suffer past persecution sufficient to show that it was more likely than not that they would face future persecution in Colombia and (b) failing to use its own judgment.[4] She further asserts that she established past persecution, and she notes that her sister Sandra has been granted asylum in the United States.

As an initial matter, Franco and Marin offered no argument on their claims, and thus they have abandoned them. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 (11th Cir. 2005). Therefore, the only issue before us is whether Rubio established eligibility for withholding of removal.[5] Importantly, withholding of removal does not provide for derivative benefits. Therefore, even if the record compelled withholding of removal, only Rubio, and not her parents, would be entitled to relief. See Delgado v. U.S. Att'y Gen., 487 F.3d 855, 862 (11th Cir. 2007).

We review "only the decision of the BIA, except to the extent that it expressly adopts the IJ's opinion." Nreka v. U.S. Att'y Gen., 408 F.3d 1361, 1368 (11th Cir. 2005) (internal quotations and citation omitted). To the extent that the

---

[4] Rubio does not challenge the determination that she is not eligible for asylum or CAT relief. Therefore, she has abandoned those issues. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 (11th Cir. 2005).

[5] We do not consider this evidence because it was not presented to the BIA. Al Najjar v. U.S. Att'y Gen., 257 F.3d 1262, 1283 (11th Cir. 2001).

BIA's or IJ's decision was based on a legal determination, review is de novo. Id. The IJ's and BIA's factual determinations are reviewed under the substantial evidence test, and this court will "affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (alteration in original) (internal quotations and citations omitted); Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (quotation and internal marks omitted). We will not reverse unless the record compels a contrary conclusion. Ruiz v. Gonzales, 479 F.3d 762, 765 (11th Cir. 2007) (citing Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002)).

To obtain withholding of removal, an applicant must establish that her "life or freedom would be threatened in that country because of his race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). "The alien bears the burden of demonstrating that it is 'more likely than not' she will be persecuted or tortured upon being returned to her country." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 (11th Cir. 2005) (quoting Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002)). An applicant for withholding of removal may satisfy her burden of proof in either of two ways. First, an alien may establish "past persecution in his country based on a protected ground." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir.

6

2003). If the applicant can show that the persecution was, at least in part, motivated by a protected ground, then the applicant can establish eligibility for withholding of removal. Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006). If an alien establishes "past persecution," a rebuttable presumption arises that she has a "well-founded fear of future persecution," and the burden then shifts to the Department of Homeland Security to show that the conditions in the country have changed or the alien could avoid a future threat through relocation. Mendoza, 327 F.3d at 1287. Second, an alien is entitled to withholding of removal if she establishes "that it is more likely than not that she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country." 8 C.F.R. § 208.16(b)(2).

In considering a petitioner's claim for withholding of removal, the IJ must determine credibility in the same manner as in asylum cases. See 8 U.S.C. § 1231(b)(3)(C); 8 U.S.C. § 1158(b)(1)(B)(ii)-(iii). Thus, to establish entitlement to relief, the applicant must establish past persecution with "specific and credible evidence." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1202 (11th Cir. 2005). IJs must make "clean determinations of credibility." Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1257 (11th Cir. 2007). Here, because the IJ did not make an explicit adverse credibility determination, we consider Rubio's testimony to be credible.

As this court has explained, "'persecution' is an extreme concept, requiring

7

more than a few isolated incidents of verbal harassment or intimidation, and . . . mere harassment does not amount to persecution." Sepulveda v. U.S. Att'y Gen, 401 F.3d 1226, 1231 (11th Cir. 2005) (internal quotations omitted); see also Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1237 (11th Cir. 2006) (concluding that a written death threat alone did not compel a finding of past persecution).

In several recent cases, this court has explored the issue of persecution, analyzing the types of acts that, considered cumulatively amount to persecution. See Mejia, 498 F.3d at 1255 (finding past persecution where petitioner experienced "threats and attempted attacks over an eighteen-month period, which culminated when [the petitioner was] stopped on a roadway by three armed members of the FARC, who threatened [him] at gunpoint, threw him to the ground, and smashed him in the face with the butt of a rifle, breaking his nose."); Ruiz, 479 F.3d at 766 & n.2 (finding past persecution where the petitioner suffered repeated death threats, was twice physically assaulted, and was kidnaped and held against his will by FARC for eighteen days); see also Niftaliev v. U.S. Att'y Gen., 504 F.3d 1211 (11th Cir. 2007) (finding the cumulative effect of numerous beatings, arrests, searches, and interrogations, culminating in a fifteen-day, food-deprived detention compelled a finding of past persecution); Delgado, 487 F.3d at 862 (concluding that when considered cumulatively, the death threats, threats with unloaded weapons, and a beating compelled a finding of past persecution).

8

Moreover, this court recently explained that it could consider a threatening act against another as evidence that the petitioner suffered persecution where that act concomitantly threatens the petitioner. Santamaria v. U.S. Att'y Gen., slip op. at 827 n.7 (11th Cir. Jan.11, 2008); see also Ruiz, 479 F.3d at 762 (considering a rape of the petitioner's friend's wife during the kidnaping of petitioner as evidence of persecution); Niftaliev, 504 F.3d at 1211 (noting same); Delgado 487 F.3d at 861-62 (considering severe beating of petitioner's son as evidence that petitioner suffered persecution).

We conclude that the record in this case does not compel the conclusion that Rubio suffered past persecution or that it is more likely than not that she would be persecuted on account of a protected ground. According to the testimony, FARC sought to recruit Rubio because of her access to information. It did not single her out for persecution on account of her political opinion. In fact, Rubio did not identify any political opinion attributed to her. The refusal to cooperate with guerillas does not qualify as persecution on account of a political opinion. Rodriguez Morales v. U.S. Att'y Gen., 488 F.3d 884, 890 (11th Cir. 2007). Moreover, none of the incidents described rise to the level of persecution. Cf. Santamaria, slip op. at 827 n.7; Niftaliev, 504 F.3d at 1211; Delgado 487 F.3d at 861-62; Ruiz, 479 F.3d at 762.

Even if we were to consider the shooting against Franco as evidence of

9

persecution against Rubio, this incident does not compel us to conclude that Rubio suffered persecution. Franco alleged that she was singled out due to her religious actions, and not due to political motivations. Franco could not identify the shooter, there were no corroborating reports, and the only evidence to connect the incident to FARC was a phone call after the incident.

Because the record does not compel the conclusion that Rubio suffered past persecution or that it was more likely than not that she would face persecution should she return to Colombia, we **DENY** the petition.