[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 31, 2008
THOMAS K. KAHN
CLERK

No. 08-11465
Non-Argument Calendar
_____

Agency Nos. A95-890-985,
A95-890-986

CESAR CELESTINO-CONTRERAS,
FRANCY ELENA CONTRERAS,
CESAR ANDRES CONTRERAS-YANEZ,
DIANA MELISSA CONTRERAS-YANEZ,

                                                    Petitioners,

versus

U.S. ATTORNEY GENERAL,

                                                    Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(December 31, 2008)

Before CARNES, WILSON, and PRYOR, Circuit Judges.

PER CURIAM:

Cesar Celestino-Contreras, his wife, Francy Elena Contreras, and their children, Cesar Contreras-Yanez and Diana Contreras-Yanez, appeal the Board of Immigration Appeals' judgment dismissing their appeal from the immigration judge's denial of their applications for asylum and withholding of removal under the Immigration and Nationality Act, INA §§ 208, 241, 8 U.S.C. §§ 1158, 1231.[1] Celestino-Contreras[2] contends that the BIA erred when it affirmed the IJ's judgment because he presented enough evidence to establish: (1) changed circumstances sufficient to waive the one-year filing requirement for an asylum application; and (2) that he is entitled to withholding of removal because he has shown that it is more likely than not he will be persecuted if he returns to Colombia.

Celestino-Contreras, Contreras, and their two children, are natives and citizens of Colombia, and were admitted to the United States in March 2000 as

---

[1] The IJ also denied relief under the Convention Against Torture. Because Celestino-Contreras did not present any argument to the BIA or this Court for CAT relief, he has abandoned that claim. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (holding that a party abandons an issue when it fails to offer any argument about that issue on appeal).

[2] In his initial application for asylum and withholding of removal, Celestino-Contreras listed his wife and children as derivative applicants. Later, each family member submitted a separate application that included a copy of Celestino-Contreras' Application for Asylum and Withholding of Removal (Form I-589). The BIA considered the claims of all four family members in one judgment, identifying Celestino-Contreras as the "lead respondent." Similarly, in reviewing the BIA's judgment as to all four respondents, for convenience we refer mostly to Celestino-Contreras, unless context requires otherwise.

2

nonimmigrant visitors with authorization to remain for six months. In January 2004, Celestino-Contreras filed an application for asylum and withholding of removal under the INA, which stated that he feared returning to Colombia because of his political opinion and membership in a particular social group. The asylum officer referred the matter to an immigration judge. In July 2005 the Department of Homeland Security issued Celestino-Contreras, his wife, and two children notices to appear, charging them with removability under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), as aliens who remained in the United States for a longer time than permitted. Celestino-Contreras, Contreras, and their two children admitted the allegations in the notices to appear and conceded removability.

During removal proceedings, both Celestino-Contreras and Contreras testified. They explained that their fear of returning to Colombia stemmed from Celestino-Contreras' involvement with the Liberal Party. Celestino-Contreras was politically active in Colombia for ten years, starting in 1990 when he began working on his uncle's senate campaign and ending in 2000 when he left Colombia for the United States. During that time, Celestino-Contreras became concerned that the 30th Front of the Revolutionary Armed Forces of Colombia[3] would try to

---

[3] The 30th Front is a division of the FARC that operates in the area surrounding Celestino-Contreras' hometown.

harm him and his family. As a result, Celestino-Contreras, Contreras, and their two children left for the United States.

After the removal proceedings, the IJ determined that Celestino-Contreras and his wife and children were ineligible for asylum because Celestino-Contreras did not file his application for asylum within one year of the date he and his family entered the United States. The IJ also determined that they had failed to establish a basis for withholding of removal because the events Celestino-Contreras described did not establish persecution. Celestino-Contreras appealed the IJ's decision to the BIA. The BIA dismissed the appeal, agreeing with the IJ that Celestino-Contreras and his family were ineligible for asylum and that they had failed to demonstrate eligibility for withholding of removal. Celestino-Contreras appeals that judgment.

## I.

Members of the FARC began contacting Celestino-Contreras and other members of his politically active family in 1992. In the first encounter, a man identifying himself as commander of the 30th Front of the FARC called Celestino-Contreras and told him to stop working in areas controlled by the FARC. At the time, Celestino-Contreras was working on his uncle's senate campaign, and his co-workers had already received similar calls. Later that year, members of the FARC

4

visited Celestino-Contreras' parents at home and told them that their family should stop all political activity if they wanted to live a "normal life."

Celestino-Contreras next heard from the FARC after his brother's death in 1995. Celestino-Contreras' brother, who worked on their uncle's campaign as a finance director, was shot and killed at his university. Shortly after that, the FARC contacted Celestino-Contreras and told him that if he continued his political work he would "have the same luck" as his brother. Celestino-Contreras "thought that things would change" and continued to be politically active and participate in community outreach work. A few years later the FARC kidnapped Celestino-Contreras' uncle, then a former senator, and held him for five months, prompting his uncle to leave politics altogether. Celestino-Contreras continued his political campaign work, in part for another uncle who was a city councilman. Later that same year, Celestino-Contreras' other brother was "torn apart, with a knife." The FARC left a note attached to the body claiming responsibility and warning that such a death "would be the fate of all that did not work with them."

In 1999 while Celestino-Contreras was traveling with a political campaign, his wife received a call from someone threatening to harm their children. The caller told her that he knew who her children were and where they went to school, and that Celestino-Contreras should stop working for a "senseless" cause. The

5

caller told her that her husband would know who was calling because he had received similar calls before. After that threat, Contreras, who already had a visa to visit the United States because of a planned trip to Disneyland, went to the United States and the children joined her shortly thereafter. They stayed in the United States for about five months before returning to Colombia to "organize and to gather money." Back in Colombia, in early 2000, Contreras received a phone call at work from a FARC member who again stated that he knew how to get to the children.

Around the same time, members of the FARC went to a political party meeting attended by Celestino-Contreras. Five hooded men arrived, locked the doors, put the attendees on the ground, and "gave [them] an ultimatum to give up the struggle on behalf of [their] country." They presented a condolence note sent by their commander listing sixteen "departed" political leaders. Celestino-Contreras' name was on that list. The FARC members said that the list was their commander's way of showing how seriously he took the matter. After that meeting, the attendees received multiple threatening phone calls and notes.

Several months later three people in military uniforms went to Celestino-Contreras' workplace, identifying themselves as FARC members. They assaulted and insulted him, and asked him if he wanted to live. They also told him that "this

was the last chance." Again, they followed up with phone calls. After that, Celestino-Contreras, Contreras, and their two children fled to the United States.

Celestino-Contreras' uncle, the councilman, fled to the United States with his family that year after FARC members told him to resign if he wanted his family to live. Within the next two years, the FARC killed another councilman from the same city and killed the leader of Celestino-Contreras' political group.

## II.

Celestino-Contreras first contends that we have jurisdiction to review the BIA's denial of his asylum application. After reviewing <u>de novo</u> whether we have subject matter jurisdiction, <u>Ruiz v. Gonzales</u>, 479 F.3d 762, 765 (11th Cir. 2007), we disagree.

Celestino-Contreras entered the United States in 2000 and applied for asylum over a year later. The BIA determined that Celestino-Contreras' asylum application was untimely and that he did not demonstrate changed circumstances affecting his eligibility or extraordinary circumstances to justify the delay in filing. Because the BIA did not explicitly adopt the IJ's reasoning, we review only the BIA's decision. See <u>Al Najjar v. Ashcroft</u>, 257 F.3d 1262, 1284 (11th Cir. 2001).

An asylum application may be considered if it is "filed within [one] year after the date of the alien's arrival in the United States," 8 U.S.C. § 1158(a)(2)(B). There

7

is an exception to that time limit "if the alien demonstrates . . . either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified . . . ." 8 U.S.C. § 1158(a)(2)(D). Whether an alien can apply for asylum is a determination left exclusively to the Attorney General, and "[n]o court shall have jurisdiction to review any determination of the Attorney General under [§ 1158(a)(2)]." 8 U.S.C. § 1158(a)(3).

Celestino-Contreras argues that the REAL ID Act of 2005, 8 U.S.C. § 1252(a)(2)(D), extends our jurisdiction to include review of his asylum claim. The REAL ID Act provides, in pertinent part:

> Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

8 U.S.C. § 1252(a)(2)(D). Celestino-Contreras argues that we have jurisdiction over his asylum appeal because he presents a question of law and a constitutional violation and that both challenges fall within the Act. More specifically, he argues that the BIA erred by (1) affirming the IJ's legally erroneous conclusion that the evidence he presented did not establish the "changed circumstances" exception to the one-year filing requirement and (2) violating his due process rights when it

8

"ignored the agency's own law" in finding that he failed to establish changed circumstances.

However, as we have previously explained, "the timeliness of an asylum application is not a constitutional claim or question of law covered by the Real ID Act's changes." See Chacon-Botero v. U.S. Att'y Gen., 427 F.3d 954, 957 (11th Cir. 2005). Included in that non-reviewable timeliness determination is the question of whether the exceptions to the one-year requirement apply.[4] See Mendoza v. United States Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003) (finding that § 1158(a)(3) "divests [us] of jurisdiction to review a decision regarding whether an alien complied with the one-year time limit or established extraordinary circumstances that would excuse his untimely filing"); Chacon-Botero, 427 F.3d at 957 (adhering to same after enactment of the Real ID Act). Therefore, we lack jurisdiction to review the denial of Celestino-Contreras' asylum claim as time-barred.

## III.

---

[4] Further, with respect to the alleged constitutional violation, Celestino-Contreras argues that we have jurisdiction because the BIA's decision raises a due process issue by "ignor[ing] the agency's own law" relating to the exceptions to the one-year filing requirement. However, because he has failed to specify what law the BIA allegedly ignored Celestino-Contreras has abandoned that issue on appeal. See United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (noting that passing references to an issue are insufficient to raise an issue for appeal and that such issues are deemed abandoned).

9

Celestino-Contreras next contends that he is entitled to withholding of removal because he has established past persecution based on his political opinion and is therefore entitled to the presumption that his life or freedom would be threatened upon return to Colombia.[5] Further, he argues that the government failed to rebut that presumption.

The IJ determined that Celestino-Contreras did not demonstrate eligibility for withholding of removal. The BIA agreed. In its opinion, the BIA drew on some of the IJ's findings, and to the extent it adopted the IJ's reasoning, we consider both the IJ and BIA decisions. See Al Najjar, 257 F.3d at 1284. When considering a petition to review a final order issued by the BIA, we review de novo legal issues, see Mohammed v. Ashcroft, 261 F.3d 1244, 1247 (11th Cir. 2001), but we review factual findings under the substantial evidence test. See Al Najjar, 257 F.3d at 1283 (11th Cir. 2001). Under the substantial evidence test, we must affirm the decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 1284 (internal quotation marks and citation omitted). "To reverse a factual finding by the BIA, [we] must find not only that the evidence supports a contrary conclusion, but that it compels one." Farquharson v. U.S. Att'y

---

[5] Because we determine that the record compels a conclusion of past persecution based on his political opinion, we need not consider whether Celestino-Contreras has also established that he "very likely will suffer future persecution at the hands of the FARC guerillas if forced to return to Colombia."

Gen., 246 F.3d 1317, 1320 (11th Cir. 2001). The fact that evidence in the record may also support a conclusion contrary to the administrative findings is not enough to justify a reversal. See Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).

An alien seeking withholding of removal under the INA must show that his "life or freedom would be threatened . . . because of the alien's race, religion, nationality, membership in a particular social group, or political opinion" if he returned to the country in question. 8 U.S.C. § 1231(b)(3)(A). To do so, he must demonstrate that "he more-likely-than-not would be persecuted or tortured upon his return to the country." Mendoza, 327 F.3d at 1287.

If an alien establishes past persecution in his country based on a protected ground, it is presumed that his life or freedom would be threatened upon return to his country unless the government shows by a preponderance of the evidence that (1) the country's conditions have changed so that the applicant's life or freedom would no longer be threatened upon his removal; or (2) the alien could avoid a future threat to his life or freedom by relocating to another part of his country and it would be reasonable to expect him to do so. See 8 C.F.R. § 208.16(b)(1)(i); Mendoza, 327 F.3d at 1287.

11

Persecution is an "extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and . . . mere harassment does not amount to persecution" Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (internal quotation marks and citation omitted). Determining whether an alien has suffered past persecution requires a consideration of the cumulative effect of the events on the record. See Ruiz v. U.S. Att'y Gen., 479 F.3d 762, 766 (11th Cir. 2007). The cumulative effect of the events in this record compel the conclusion that Celestino-Contreras suffered past persecution and is entitled to the presumption that his life and freedom would be threatened upon return to Colombia.

As the BIA observed and accepted, the IJ did not make an explicit adverse credibility determination. Therefore, we must accept Celestino-Contreras' testimony as true.[6] Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1255, n.2 (11th Cir. 2007). Further, "uncorroborated but credible testimony from the applicant may be sufficient alone to sustain the burden of proof for . . . withholding of removal." D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818–19 (11th Cir. 2004).

---

[6] The IJ had "some problems with the respondent's credibility" because Celestino-Contreras testified to "important and highly relevant events" that did not appear in his application. Those events include: (1) members of the FARC visiting his parents in 1992; (2) his wife and children going to the United States in 1999 and the reason for that visit; and (3) members of the FARC going to a meeting of Celestino-Contreras' political party. The BIA determined the IJ had "questioned portions of the respondent's testimony," but that the IJ had "not issue[d] a specific adverse credibility finding."

12

Celestino-Contreras did not suffer severe physical harm, but that is not a requirement for past persecution where the record contains repeated threats combined with other forms of severe mistreatment. See De Santamaria v. U.S. Att'y Gen., 525 F.3d 999, 1009–1010 (11th Cir. 2008) (explaining that no serious physical injury is required to establish past persecution where an applicant demonstrates repeated threats combined with other forms of serious mistreatment like attempted murder, kidnapping, or assault with a firearm resulting in a broken nose). We conclude that there was serious mistreatment here. The FARC killed two of Celestino-Contreras' brothers.[7] Although not direct attacks on Celestino-Contreras, the murders "concomitantly threaten[ed] the petitioner." See id. at 1009 n.7 (considering the murder of the applicant's groundskeeper who had refused to reveal the applicant's whereabouts as evidence of persecution); see also Delgado v. U.S. Att'y Gen., 487 F.3d 855, 861–62 (11th Cir. 2007) (considering the severe beating of applicant's son as evidence that applicant suffered persecution). After killing one brother, members of the FARC specifically used that death as a threat to

---

[7] The BIA stated that Celestino-Contreras "suspected that the FARC killed two of his brothers, but he could not corroborate these assertions." Corroboration, however, is not required. See 8 C.F.R. § 208.16(b) ("[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof [in a withholding of removal case] without corroboration."); Niftaliev v. Att'y Gen., 504 F.3d 1211, 1217 (11th Cir. 2007). According to Celestino-Contreras' credible testimony, he "suspected" that the FARC killed his brothers because members of the FARC themselves took credit for both killings. Additionally, Celestino-Contreras produced death certificates for both brothers.

13

Celestino-Contreras by calling him and telling him that he was next. After killing the other brother, members of the FARC left a note identifying themselves and explaining precisely how the death was to be interpreted—as a warning to others, like Celestino-Contreras, who opposed the FARC.

Here the violent and intimidating acts that threatened Celestino-Contreras, taken as a whole, include: multiple phone calls threatening Celestino-Contreras and his family; two face-to-face encounters between Celestino-Contreras and members of the FARC, one in which he was assaulted, insulted, and threatened and the other in which he was identified as a "departed" leader; and the killing of Celestino-Contreras' two brothers. Those events amount to more than a few isolated incidents of harassment or intimidation, see Sepulveda, 401 F.3d at 1231, and the BIA's determination that the events Celestino-Contreras described did not rise to the level of persecution is not supported by substantial evidence on the record. See Al Najjar, 257 F.3d at 1283. The events on the record amount to past persecution and indicate a future threat to Celestino-Contreras' life or freedom in Colombia. See Mendoza, 327 F.3d at 1287. Thus, Celestino-Contreras has met his burden of proving that if he returns to Colombia it is more likely than not that he will be persecuted for his political opinion. Id.

14

The government has neither proffered evidence nor raised any argument that relocation was a reasonable option or that country conditions have changed to diminish the threat facing Celestino-Contreras in Colombia. Therefore, the government has waived those arguments. See Montano Cisneros v. U.S. Att'y Gen., 514 F.3d 1224, 1226 n.1 (11th Cir. 2008) ("The Government's argument here was not raised in their brief and is therefore waived."); Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223 (11th Cir. 2007) (remanding applicant's case "to allow the IJ to determine whether [applicant] can relocate within Colombia" where the IJ overlooked substantial evidence on the issue, but making no instruction to the IJ to consider changed country conditions where "the government does not argue, and there is no evidence in this record, that conditions in Colombia have changed to the extent that the FARC would no longer target [applicant] if he returned to Colombia."). We conclude that Cesar Celestino-Contreras is entitled to withholding of removal.

We do not, however, decide whether his wife, Francy Contreras, or their two children, Cesar Contreras-Yanez and Diana Contreras-Yanez, are entitled to withholding of removal. The BIA decided that they were not, but that decision was based on its conclusion, which we are setting aside, that Celestino-Contreras himself was not entitled to it. The remaining issue is whether, in light of the fact

15

that Celestino-Contreras is entitled to withholding of removal, his wife and two children are as well. That, however, is a different question. The BIA has not answered that question yet, and it should do so in the first instance. See INS v. Ventura, 537 U.S. 12, 16-17, 123 S.Ct. 353 (2002) ("A court of appeals is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry. Rather, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." (internal quotation marks and citations omitted)).

**PETITION DISMISSED IN PART, GRANTED IN PART, AND REMANDED IN PART.**