[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 22, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-16221

_____

BIA No. A79-494-366

XIMENA SANZ DE SANTAMARIA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(APRIL 22, 2008)**

Before EDMONDSON, Chief Judge, DUBINA, Circuit Judge, and
STORY,[*] District Judge.

---

[*] The Honorable Richard W. Story, United States District Judge for the Northern District
of Georgia, sitting by designation.

STORY, District Judge:

This Court sua sponte vacates its prior opinion, published at 512 F.3d 1308 (11th Cir. 2008), and enters the following opinion in its place.

This is an asylum case, in which we have been asked to determine whether Ximena Sanz de Santamaria, a Colombian lawyer and political activist, was politically persecuted by the Revolutionary Armed Forces of Colombia when she was repeatedly threatened, twice physically attacked, terrorized by the torture and murder of a family friend who refused to give information on her whereabouts, and finally, kidnapped and beaten only to narrowly escape with her life by the intervention of the Colombian military. The Immigration Judge ("IJ"), despite finding that these acts occurred, concluded that they did not rise to the level of persecution. The IJ also found that Santamaria could not demonstrate a subjective fear of future persecution because she left and returned to Colombia on several occasions between the time these incidents occurred. The Board of Immigration Appeals ("BIA") affirmed. Because the record compels us to conclude otherwise, we grant Santamaria's petition, vacate the denial of her asylum application, vacate the order of removal, and remand to the BIA for proceedings consistent with this opinion.

## I.  BACKGROUND

Santamaria is a native and citizen of Colombia. At her hearing before the IJ, Santamaria testified that she was an active member of the Colombian Liberal Party and various other political and social groups. She was formerly married to the Colombian ambassador to Peru and often met with Colombian political leaders in Bogota. In 1993, while studying law, Santamaria joined the New Democratic Force, a group devoted to advancing democratic government in Colombia. Santamaria often traveled to Mosquera, a town on the outskirts of Bogota, to speak with teenagers in support of the democratic leadership of Colombia and against joining rebel groups such as the Revolutionary Armed Forces of Colombia ("FARC"). Santamaria also raised funds on behalf of impoverished people in Mosquera and assisted in efforts to construct new schools there. In 1997, after completing her law degree, Santamaria founded Ayuda Con Amor ("Help With Love"), an organization that raised money to assist the poor in Mosquera and other municipalities surrounding Bogota. By 1998, she was regularly holding meetings with citizens of Mosquera to discuss local political affairs. She also campaigned for the reelection of the mayor of Mosquera, who opposed FARC's presence in the region.

Santamaria testified that it was on account of these activities that she became a political target of FARC. Soon after she began traveling to Mosquera to

3

hold meetings, Santamaria started receiving threats by mail and telephone, warning her that FARC would retaliate if she did not end her political activities. In November of 1998, Santamaria had her first face-to-face encounter with FARC rebels. While she was driving away from her home in Bogota, three men dressed in camouflage and wearing FARC bracelets intercepted Santamaria. The men surrounded her vehicle, and one forced Santamaria out of her car by her hair. He threw her face-first onto the ground, and jarred his foot into Santamaria's back. The man identified himself as Commander Julian from the Fifth Front of the FARC, insulted Santamaria for her work in support of the Colombian government, and told her that she was an "enemy of the people." He warned Santamaria that she would be killed if she was caught again in Mosquera. After the incident, Santamaria was taken to the hospital and treated for wounds to her face and back.

After the November 1998 encounter, Santamaria changed residences and had a bulletproof door installed on her apartment door in Bogota.[1] But she continued traveling to Mosquera, albeit less visibly. To evade detection, she used different vehicles for transportation and often refrained from speaking publicly. Still, she received phone threats at her parents' farm in Bogota. In July of 1999,

---

[1] A receipt evidencing the purchase and installation of the bulletproof door was introduced at the hearing before the IJ. (See Admin. Rec. at 335-36.)

she returned to Bogota to find red graffiti reading "Death to Help With Love" painted on her parents' home. She found similar graffiti threatening the organization she had founded painted on the main square of Mosquera.

Santamaria testified that she feared that FARC rebels would carry out their threats. She visited a psychiatrist, who treated her for anxiety. In the two months that followed, Santamaria left Colombia on at least three occasions. She traveled to the United States once in August of 1999 and twice in September of 1999. She testified that she traveled abroad in part to evade detection by FARC rebels, and in part to relieve the increasing stresses of her Colombian life. But despite the threats she received from FARC, Santamaria returned to Colombia, determined to continue her political and philanthropic activities.

On December 1, 1999, several FARC members showed up at Santamaria's farm looking for Santamaria. Santamaria's groundskeeper and long-time family friend, Mario, was there alone with his son. The men demanded to know Santamaria's whereabouts. Mario resisted, and the men began torturing Mario. When Mario continued to refuse to disclose Santamaria's location, the men shot Mario to death in the presence of his son.

As the result of Mario's killing, Santamaria again sought psychiatric help.

5

Her family encouraged her to leave Colombia. Instead, she attempted to change her appearance by cutting her hair and dying it black and resolved to continue her work in Mosquera. On December 10, 1999, she quietly planned to make a trip to Mosquera with several members of Help With Love to deliver grants to several children in Mosquera. She told no one of their plans. On the way to the meeting, the bus she was riding stopped at a grocery store where she knew the owner. She entered the store and found the owner unusually quiet, but nervously attempting to communicate something to Santamaria. At that point, a man who had been loitering in the store stepped up and shot the store owner. Approximately nine other men appeared. They identified themselves as members of FARC and read aloud a list of four wanted individuals, including Santamaria. After identifying Santamaria, one said to her, "we've told you not to show yourself again you bourgeois governmental bitch." The men took Santamaria into the back, forced her onto the ground, and began beating her with the butts of their guns. Eventually, the men loaded Santamaria into a van. One told Santamaria that they were going to a camp in the mountains, where she would first meet the local FARC commander and then be killed. After the van traveled about two miles, Santamaria heard gunshots, and the van stopped. The FARC men left the van and engaged in a firefight with the Colombian military. One Colombian soldier ran up

6

to the van and freed Santamaria. She was eventually airlifted out by helicopter to a hospital in Bogota and treated for trauma and wounds to her face and thorax.

Santamaria's anxiety grew worse. In March of 2000, Santamaria left Colombia to spend some time in the United States, but returned to Colombia and stayed for several more months. She continued to receive threatening phone calls. On August 1, 2000, Santamaria reported the above-described incidents to the police.[2] At the strong encouragement of her family, she finally fled to the United States on August 29, 2000.

After her departure, FARC continued to look for Santamaria in Colombia. While her mother lay sick in the hospital for an extended period of time, a FARC rebel telephoned her mother's doctor to determine whether Santamaria had visited. Santamaria testified that she wishes to return to Colombia—particularly to be with her mother—but that her fear of being killed by FARC has caused her to remain in the United States.

## II. COURSE OF PROCEEDINGS

Santamaria was admitted to the United States on August 29, 2000, as a nonimmigrant B-2 visitor, with authorization to remain until February 28, 2001.

---

[2] Santamaria testified that she decided not to report the incidents described above to the police on an earlier occasion because she feared that it would lead to more retaliation.

7

On June 29, 2001, Santamaria filed an application for asylum, withholding of removal, and relief under the U.N. Convention Against Torture. At a hearing before the IJ, Santamaria testified as to the events described above.

The IJ found that Santamaria's testimony was credible and consistent with her application. Nevertheless, he denied Santamaria's application. In an oral decision entered on May 26, 2005, the IJ held that Santamaria was ineligible for asylum because she had failed to establish either past persecution or a well-founded fear of future persecution on account of one of the statutorily protected grounds. The IJ began his decision by summarizing Santamaria's testimony, including the incident with Commander Julian, the repeated death threats, the murder of Mario, and the eventual kidnapping and beating of Santamaria. He found that "the respondent did have some injuries, concerning these, which were documented, by a summary of medical reports, which the respondent obtained shortly [before] coming to the United States." (Admin. Rec. at 65.) Nevertheless, he concluded that these events "do not amount to persecution in the past." (Id.)

As for a well-founded fear of future persecution, the IJ found that Santamaria failed to demonstrate a subjective fear of future persecution. He reasoned that Santamaria's numerous instances of returning to Colombia after

8

receiving threats from FARC undermined her testimony that she feared

persecution:

> As to the respondent's claim for a fear of future persecution, the respondent's actions, negate this completely. The respondent traveled back to her country, five times, and also visited the Dominican Republic, after these events, which she claimed she would be killed for if she returned now occurred [sic]. The Court understands the respondent's explanation, that she used to come to the United States many times, yet, the Court does not understand, how it is that the respondent traveled not one, not two, not three, not four, but five times back to her country if she contends that she would be harmed there at this time. The fact of these many departures, and reentries to her country, significantly negate [sic] any subjective fear of persecution if she were to return at this time.

(Id. at 66.)

The IJ also denied Santamaria's claims for voluntary departure, withholding

of removal, and relief under the U.N. Convention Against Torture.[3]

Santamaria appealed to the BIA. The BIA summarily affirmed and adopted

the IJ's decision denying Santamaria's application. (Id. at 2.) Thereafter,

Santamaria timely petitioned this Court to review her application for asylum.

On appeal, Santamaria argues that substantial evidence does not support the

IJ's finding that she did not suffer past persecution on account of her political

---

[3] Santamaria does not challenge the denial of her claims for voluntary departure, withholding of removal, and relief under the U.N. Convention Against Torture, and as such, they are abandoned on appeal. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1283 n.12 (11th Cir. 2001).

opinion. She also contends that the IJ erred in finding that her voluntary return to Colombia on five occasions between 1999 and 2000 negates her testimony that she subjectively fears future persecution. The government responds that Santamaria has failed to demonstrate past persecution on account of her political opinion, and that FARC's actions only intimidated Santamaria based upon her wealth or based upon its own general efforts to establish control over Mosquera and the other areas in which Santamaria worked.

## III. STANDARD OF REVIEW

Where the BIA expressly adopts the decision of the IJ as its own, we review the IJ's decision. Al Najjar, 257 F.3d at 1284. We review the IJ's factual determinations under the substantial evidence test, and we will affirm the IJ's decision if it is supported by "'reasonable, substantial, and probative evidence on the record considered as a whole.'" Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007) (quoting Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005)). We will not reverse unless the record compels a contrary conclusion. Ruiz v. Gonzales, 479 F.3d 762, 765 (11th Cir. 2007) (citing Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002)).

## IV. DISCUSSION

### A. Legal Standards

10

To be eligible for asylum, an applicant must prove that she is a "refugee" within the meaning of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1158(b)(1)(A); see generally Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1231-32 (11th Cir. 2007). A "refugee" is defined, in relevant part, as:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).

An applicant can prove refugee status in one of two ways: by demonstrating past persecution or fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.13(b). The applicant must present "'specific and credible evidence'" in support of her asylum application, Sanchez Jimenez, 492 F.3d at 1232 (quoting Scheerer v. U.S. Att'y Gen., 445 F.3d 1311, 1315 (11th Cir. 2006)), but "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13.

1.  *Past Persecution Asylum*

To establish asylum based on past persecution, the applicant must prove (1)

11

that she was persecuted, and (2) that the persecution was on account of a protected ground. 8 C.F.R. § 208.13(b)(1); Sanchez Jimenez, 492 F.3d at 1232. "[I]t is by now well-established in our case law that an applicant can establish eligibility for asylum as long as he can show that the persecution is, 'at least in part, motivated by a protected ground.'" Sanchez Jimenez, 492 F.3d at 1232 (quoting Rivera v. U.S. Att'y Gen., 487 F.3d 815, 821 (11th Cir. 2007)) (emphasis removed). In addition to providing an independent avenue for asylum eligibility,[4] a showing of past persecution creates a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1); Sanchez Jimenez, 492 F.3d at 1232 (citing Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (per curiam)). The applicant's presumptively well-founded fear of future persecution may be rebutted by the government if the government shows, by a preponderance of the evidence, either: (1) that conditions in the country have changed, or (2) that the applicant could avoid future persecution by relocating within the country if, "under all the circumstances, it would be reasonable to expect the applicant to do

---

[4] An applicant who demonstrates past persecution, but fails to demonstrate a well-founded fear of future persecution, may still be granted asylum, if (1) "[t]he applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution," or (2) if "[t]he applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 208.13(b)(1)(iii). Santamaria did not contend at her hearing before the IJ that she was eligible for asylum under Section 208.13(b)(1)(iii), and she does not argue that matter here, so we do not address it.

12

so."[5]  8 C.F.R. § 208.13(b)(1)(i); Arboleda v. U.S. Att'y Gen., 434 F.3d 1220, 1223 (11th Cir. 2006) (per curiam).

2.    *Future Persecution Asylum*

If the applicant fails to demonstrate past persecution, an applicant may still establish asylum based upon proof of a well-founded fear of future persecution.  8 C.F.R. § 208.13(b)(2).  The applicant may prove eligibility by demonstrating (1) a subjectively genuine and objectively reasonable fear of persecution that is (2) on account of a protected ground.  8 C.F.R. § 208.13(b)(2)(i); Sanchez Jimenez, 492 F.3d at 1232.  "'The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution."  Id. (quoting Al Najjar, 257 F.3d at 1289).  The objective prong can be fulfilled by establishing that the applicant "has a good reason to fear future persecution."  Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1257 (11th Cir. 2006).

Once the applicant makes an initial showing of fear of future persecution, the government may rebut the applicant's evidence by demonstrating, based upon a preponderance of the evidence, that the applicant could avoid future persecution

---

[5] Because the IJ in this case found that Santamaria had not shown past persecution or a well-founded fear of persecution, he did not reach the issue of whether conditions in Colombia have changed or whether Santamaria could safely reside elsewhere within Colombia.

by relocating within the country if, "under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(2)(ii).

### 3. *Defining Persecution*

The term "persecution" is not defined by either the INA or the federal regulations. Nevertheless, we have said that "'persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution.'" Sanchez Jimenez, 492 F.3d at 1232 (quoting Sepulveda, 401 F.3d at 1231); see also Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1237 (11th Cir. 2006) (concluding that a written death threat alone did not compel a finding of past persecution). We have also rejected a rigid requirement of physical injury, making clear in Sanchez Jimenez that "attempted murder is persecution," regardless of whether the petitioner was injured. 492 F.3d at 1233.

In determining whether an alien has suffered past persecution, the IJ must consider the cumulative effect of the allegedly persecutory incidents. Delgado v. U.S. Att'y Gen., 487 F.3d 855, 861 (11th Cir. 2007) (citing Ruiz, 479 F.3d at 766); see also Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1258 (11th Cir. 2007) ("In assessing past persecution we are required to consider the *cumulative* impact of the mistreatment the petitioners suffered." (emphasis in original)). Thus, even

14

though each instance of mistreatment, when considered alone, may not amount to persecution, the record may still compel a finding of past persecution when considered as a whole. E.g., Delgado, 487 F.3d at 861.[6]

Several of our recent cases illustrate the types of oppressive acts that collectively amount to persecution. In Mejia, we were compelled to find past persecution in a case involving "threats and attempted attacks over an eighteen-month period, which culminated when [the petitioner was] stopped on a roadway by three armed members of the FARC, who threatened [him] at gunpoint, threw him to the ground, and smashed him in the face with the butt of a rifle, breaking his nose." 498 F.3d 1253, 1255 (11th Cir. 2007). Similarly, in Ruiz, we had "no difficulty" finding past persecution where the petitioner suffered repeated death threats, was twice physically assaulted, and was kidnapped and held against his will by FARC for eighteen days. See Ruiz, 479 F.3d at 766 & n.2. And, most recently, in Niftaliev v. U.S. Att'y Gen., 504 F.3d 1211 (11th Cir. 2007), we relied on our decision in Ruiz to find that the cumulative effect of numerous beatings, arrests, searches, and interrogations, culminating in a fifteen-day, food-deprived

---

[6] In Delgado, the petitioners received death threats after refusing to support Venezuelan presidential candidate Hugo Chavez. 487 F.3d at 861. The petitioners were later stopped by masked men, who pointed unloaded weapons at them and pulled the triggers. One of the petitioners was later attacked and beaten. Although we found that "each of the incidents taken separately would not establish persecution," we held that, when considered cumulatively, the events compelled a finding of past persecution. Id. at 862.

15

detention compelled a finding of past persecution.  Id.

## B.     Santamaria's Application

Having reviewed the requirements for asylum, we turn to the central

question presented by this appeal: whether the record—which reflects that

Santamaria (1) received numerous death threats from members of FARC, (2) was

assaulted near her home, dragged by her hair out of her vehicle, and struck by

individuals identifying themselves as members of FARC, (3) was traumatized by

FARC's torture and murder of her family groundskeeper who refused to give

information on her whereabouts, and finally (4) was kidnapped by members of

FARC and beaten with the butts of their guns, after witnessing one person's

murder—compels a finding that Santamaria suffered past persecution or a well-

founded fear of persecution on account of her political opinion.  We conclude with

little difficulty that it does.

As we did in Mejia, we begin by noting that the IJ in this case made no

adverse credibility finding.  498 F.3d at 1257.  Rather, the IJ explicitly found that

Santamaria's testimony was credible and was supported by documentary evidence,

including a police report obtained on August 1, 2000, and a summary of her

medical treatment arising out of her two encounters with FARC in which she

16

sustained physical injury.  We therefore accept Santamaria's testimony as credible.

1.  *The Record Compels a Finding that Santamaria Suffered Persecution.*

Taking Santamaria's testimony as true, we are compelled to conclude that Santamaria suffered past persecution.  The record reflects that Santamaria's life was repeatedly threatened by members of FARC over the course of two years.  In July of 1999, members of FARC yanked her by the hair out of her vehicle, injured her, and specifically warned Santamaria that her continuing political activities in support of the Colombian government would earn her death.  When she defied those warnings, FARC targeted her again.  Its members painted red graffiti explicitly referencing the political organization she founded.  Despite those warnings, Santamaria continued her democratic efforts, but under attempted disguise.  Two months later, when FARC's efforts to locate Santamaria failed, her family groundskeeper was tortured and killed as a penalty for not revealing her whereabouts.[7]  Then, when FARC finally tracked down Santamaria at a local grocery, she was beaten, kidnapped, and warned of her imminent murder.  FARC's efforts to locate Santamaria continued after she fled to the United States.

---

[7] We may consider a threatening act against another as evidence that the petitioner suffered persecution where that act concomitantly threatens the petitioner.  See Ruiz, 479 F.3d at 762 (considering a rape of wife of petitioner's friend during the kidnapping of petitioner as evidence of persecution); Niftaliev, 504 F.3d at 1211 (noting same); Delgado, 487 F.3d at 861-62 (considering severe beating of petitioner's son as evidence that petitioner suffered persecution).

17

We think that these events, taken together, constitute extreme mistreatment. In so concluding, we reject the government's contention that Santamaria did not endure past persecution because the record reflects "no significant physical attacks." (Resp. at 15 n.8.) Even if Santamaria's physical injuries were relatively minor, we have not required serious physical injury where the petitioner demonstrates repeated threats combined with other forms of severe mistreatment. E.g., Ruiz, 479 F.3d at 766 & n.2 (kidnapping); Sanchez Jimenez, 492 F.3d at 1233 (attempted murder); Mejia, 498 F.3d at 1255 (assault with firearms resulting in a broken nose). Santamaria suffered the trauma of repeated death threats, two physical attacks, the murder of a family friend, and a kidnapping cut short only by a harrowing escape. These acts are sufficiently extreme to constitute persecution. Based on this undisputed testimony before the IJ, we are compelled to find that Santamaria endured past persecution.

2. *The Record Compels a Finding that Santamaria's Persecution Was On Account of Her Political Opinion.*

Moreover, the record compels the conclusion that Santamaria's persecution was on account of her political opinion. The record reflects that Santamaria's attackers made painfully clear that their motivation for their threats and violence towards Santamaria was her support of the Colombian government and her work

18

with various democratic organizations. As such, the facts in this case are closely akin to <u>Mejia</u> and <u>Ruiz</u>, where members of Colombia's Liberal Party were similarly targeted, threatened, and either physically assaulted or physically detained by members of FARC on the basis of their political opposition to FARC.[8] See <u>Mejia</u>, 498 F.3d at 1255; <u>Ruiz</u>, 479 F.3d at 766 & n.2. Because substantial evidence does not support the finding that any persecution Santamaria suffered was not on account of her political opinion, we reverse the IJ's finding in this regard. Having established past persecution on account of her political opinion, Santamaria is entitled to a rebuttable presumption that she has a well-founded fear of future persecution.

3. *Substantial Evidence Does Not Support the IJ's Independent Finding that Santamaria Failed to Demonstrate a Subjective Fear of Future Persecution.*

Because the record compels the finding that Santamaria suffered past persecution, we must vacate the IJ's conclusion that Santamaria failed to establish entitlement to asylum based upon a well-founded fear of future persecution. Having demonstrated past persecution, Santamaria is entitled to a rebuttable

---

[8] We reject the government's effort to distinguish <u>Ruiz</u> by suggesting that "Santamaria faced a situation without any direct political link . . . ." (Resp. at 15 n.8.) To the contrary, Santamaria's testimony establishes that FARC individually targeted Santamaria on account of her support of democratic organizations and her political efforts in Mosquera.

presumption that she has demonstrated a well-founded fear of future persecution.

In any event, substantial evidence does not support the factual finding on which the IJ based this conclusion: that Santamaria did not subjectively fear future persecution. The IJ based this finding on an understanding that Santamaria returned to her country five times after the persecutory acts occurred, and thus could not have feared persecution. (See Admin. Rec. at 2 ("The respondent traveled back to her country, five times, and also visited the Dominican Republic, after these events, which she claimed she would be killed for if she returned. . . . [T]he Court does not understand, how it is that the respondent traveled not one, not two, not three, not four, but five times back to her country if she contends that she would be harmed there at this time.").)

We think the IJ is mistaken on both factual and legal grounds. As a factual matter, the record reflects that most of Santamaria's travels to the United States occurred *before* the most severely persecutory acts occurred, and not "after these events." She left and returned to Colombia on three occasions—between August and September of 1999—after only her *first* face-to-face encounter with FARC in July of 1999, but before she observed the "Death to Help With Love" graffiti, learned of Mario's murder, and was forcibly kidnapped and beaten by approximately ten FARC rebels. Thus, the record reflects that Santamaria traveled

20

to the United States and returned only *once* after the most devastating acts of oppression occurred—the murder of Mario and the kidnapping and beating of Santamaria in December of 1999.[9]

As a legal matter, we conclude that the IJ erred in determining that, despite Santamaria's credible testimony that she feared persecution if she returned to Colombia, her acts in previously returning to Colombia on various occasions after traveling abroad nullified her proof of subjective fear of future persecution. An asylum applicant's voluntary return to his or her home country is a relevant consideration in determining whether the asylum applicant has a well-founded fear of future persecution. See, e.g., Ngarurih v. Ashcroft, 371 R.3d 182, 188-89 (4th Cir. 2004); Hakeem v. INS, 273 F.3d 812, 816-17 (9th Cir. 2001). Voluntary returns to a home country may weaken or undermine an applicant's claim of

---

[9] It is also far from clear that the IJ considered Santamaria's testimony concerning her motivation for these travels. The IJ characterized Santamaria's motivation for traveling to the United States as a desire to take vacation, stating that he "underst[ood] the respondent's explanation that she used to come to the United States many time[s]" for vacation. (Admin. Rec. at 10.) In doing so, the IJ does not appear to have considered Santamaria's testimony that the purpose of her trips out of Colombia was to evade detection by FARC:

> I decided to travel in and out of the country in order to change a little, a little bit, not be present all the time, not tell everybody where, where I was, and . . . I tried also to stay a little aside from the activities, and the situation was . . . I was really scared. . . .

(Admin. Rec. at 98-99.)

persecution. Id. However, we do not endorse the principle espoused by the IJ – that a voluntary return to one's home country always and inherently negates completely a fear of persecution. Cf. Pavlova v. INS, 441 F.3d 82, 89 n. 5 (2d Cir. 2006) ("In light of strong attachments to their home countries, refugees may venture abroad in a state of uncertainty about the permanence of their departure, hoping that the persecution will abate so that they can return home.").

To be well-founded, a fear of persecution must be both "subjectively genuine and objectively reasonable." Al Njjar, 257 F.3d at 1289. We have repeatedly held that the "subjective component [required to show a well-founded fear of future persecution] is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution." Sanchez Jimenez, 492 F.3d at 1232 (quoting Al Najjar, 257 F.3d at 1289). Here, Santamaria testified that she feared persecution upon her return to Colombia and that her fear has compelled her to stay in the United States despite knowing that her mother lies seriously ill in a hospital in Bogota. The IJ found Petitioner's testimony generally credible and

did not specifically discount her testimony concerning her fear of return to

Columbia.[10]

In evaluating whether an asylum applicant's subjective fear of future persecution is objectively reasonable, the totality of the circumstances surrounding any voluntary return – including the reasons for the asylum applicant's return, whether the return was without incident, and whether the applicant's family members continue to live in the home country without incident – must be considered. Here, Santamaria's fully-credited testimony reflects that the majority of her return trips to Colombia occurred prior to the most egregious incidents. Moreover, Santamaria explained that she made the trips to the United States to evade detection by FARC, but returned to Columbia each time in an effort to remain with her family and work against those responsible for her persecution and the persecution of others. Importantly, each time Santamaria returned to Colombia, the persecutory acts continued and grew more serious. In 1998, Santamaria received death threats and had one face-to-face encounter in which her car was stopped and she was thrown to the ground. After three trips to the United

---

[10] IJs must make "clean determinations of credibility," Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005), and conversely, must provide "specific, cogent reasons for an adverse credibility finding." Forgue, 401 F.3d at 1287. Where an IJ fails to explicitly find an applicant's testimony incredible and cogently explain his or her reasons for doing so, we accept the applicant's testimony as credible. See Yang, 418 F.3d at 1201 ("Though the IJ made a reference to Yang's claims as a 'ridiculous fabrication' and stated that her testimony was 'extremely inconsistent and [made] absolutely no sense whatsoever,' we are not persuaded that this was an explicit finding that Yang's testimony was not credible.").

States in 1999, Santamaria returned to Colombia, and in December 1999, FARC killed her groundskeeper when he refused to reveal Santamaria's location. Nine days later, FARC members kidnapped Santamaria and beat her with the butts of their guns. During the kidnapping, as FARC was transporting her to their mountain camp where they said she would be killed, Columbian soldiers freed her in a firefight with the FARC rebels. After her last return to Colombia in 2000, Santamaria received more threatening phone calls and reported the incidents to the police. Further, since Santamaria fled to the United States in August 2000, FARC rebels have monitored whether she has tried to return to visit her ailing mother. Under the circumstances presented in Santamaria's case, her voluntary returns were followed by continuing incidents of persecution. These returns did not negate her subjective fear of persecution or show that her subjective fear of persecution was objectively unreasonable.

In sum, we vacate the IJ's determination that Santamaria did not establish a well-founded fear of future persecution. By demonstrating past persecution, Santamaria is entitled to a rebuttable presumption that she has demonstrated a well-founded fear of future persecution. Moreover, substantial evidence does not support the IJ's conclusion that Santamaria failed to demonstrate that she subjectively feared persecution on the basis of her political opinion upon her

return to Colombia.

4.    *Remand is Proper.*

As stated, because Santamaria demonstrated that she suffered past persecution on account of political opinion, she is entitled to a rebuttable presumption that she has a well-founded fear of future persecution. The government may rebut this presumption if it shows, by a preponderance of the evidence, that either (1) the conditions in the country have changed or (2) the applicant could avoid future persecution by relocating within the country if, "under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(1)(i).

The IJ in this case made no findings regarding whether the government showed by a preponderance of the evidence that the conditions of the country have changed or that Santamaria could avoid future persecution by relocating within the country. Accordingly, we remand for a determination of these questions in the first instance. See INS v. Ventura, 537 U.S. 12, 16-17, 123 S. Ct. 353, 154 L. Ed. 2d 272 (200) (per curiam); see also Arboleda, 434 F.3d at 1223 (11th Cir. 2006) (per curiam) (outlining what the IJ should consider in evaluating whether petitioner could reasonably relocate within Colombia); Sanchez Jimenez, 492 F.3d at 1237-38 (same).

## V. CONCLUSION

Because substantial evidence does not support the findings of the IJ, we reverse and conclude that Santamaria suffered past persecution on account of her political opinion. As a result, we must also vacate the finding of the IJ that Santamaria failed to demonstrate a subjective fear of future persecution. On remand, Santamaria is entitled to the benefit of the rebuttable presumption that she has demonstrated a well-founded fear of future persecution. See 8 C.F.R. § 208.16(b)(1)(i). We remand for a determination of the limited question of whether the government has demonstrated by a preponderance of the evidence either (1) that conditions in Colombia have changed or (2) that Santamaria could avoid future persecution by relocating within Colombia if, under all the circumstances, it would be reasonable to expect her to do so. 8 C.F.R. § 208.13(b)(1)(i); see also Arboleda, 434 F.3d at 1223.

Accordingly, the Petition is **GRANTED**. The BIA's decision is **VACATED**, and the case is **REMANDED** for proceedings consistent with this opinion.