[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-13365
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 18, 2009
THOMAS K. KAHN
CLERK

Agency No. A96-021-634

ROHANLALL MOTIELAL,

Petitioner-Appellant,

versus

U.S. ATTORNEY GENERAL,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(February 18, 2009)

Before BLACK, BARKETT and WILSON, Circuit Judges.

PER CURIAM:

Rohan Motielal, a citizen of Guyana who is of Indian descent, petitions for

review of the Board of Immigration Appeals ("BIA") decision reversing the Immigration Judge's ("IJ") order granting him asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and United Nations Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment ("CAT") relief. After review, we grant the petition.

## I. BACKGROUND

Motielal entered the United States without authorization on or about February 13, 2003. On February 22, 2003, the Department of Homeland Security ("DHS") issued a Notice to Appear charging him with removability under INA §§ 212(a)(6)(C)(i) and 212(a)(7)(A)(i)(I). After appearing at a removal hearing, at which he was found to be removable as charged, Motielal filed an application for asylum, withholding of removal, and relief under CAT, claiming that he was persecuted in Guyana because of his race.

According to his application and hearing testimony, Motielal was born in Guyana but his family is of East Indian descent. Since age 12, Motielal lived with his grandfather, a cane farmer who employed mostly African workers. Motielal worked for his grandfather and was responsible for distributing the workers' weekly salaries. On October 30, 2002, Motielal's grandfather was kidnaped by four or five kidnappers "of the black race." A few months earlier, around the same time that Motielal's grandfather had acquired 50 acres of abandoned lands on

2

which to plant cane, other Indians were kidnaped and about five or six people were murdered. Motielal's family received threats but did not report the threats to law enforcement because the police were useless and the family was afraid of retribution if they contacted the police.

An hour or two after the grandfather's kidnaping, the kidnappers called Motielal's family with a ransom demand of $20 million. About an hour later, the kidnappers called again and told the family not to worry about the money because the grandfather was already dead. A few hours later, the family tried to search for the grandfather's body, but were stopped by police and army guards because the locality that they were attempting to search was very hostile toward Indians. The police threatened to lock up the family if they kept looking for the grandfather.

The kidnappers called again and provided the location of the grandfather's body. The family later found the body, which had been shot four times in the face. After the family had made burial arrangements for the grandfather, the kidnappers called and again demanded to be paid $20 million. Because Motielal was afraid that he would be kidnaped and murdered, he fled to Trinidad after the grandfather's affairs were resolved. Around this time, a group of people attempted to kidnap Motielal's cousin, mistakenly believing him to be Motielal. While staying in Trinidad with a cousin, Motielal was told that people in Guyana were looking for him. At the hearing before the IJ, Motielal testified that his uncle, grandmother,

3

and sister were still living in Guyana. Motielal also testified that the kidnappers' threats after his grandfather's death were directed at all of the family members, not just him.

Motielal believed that his grandfather was murdered because of a "racial problem" between Indians and Africans, and because Motielal's grandfather was the most successful cane farmer in the area. Motielal attached a number of documents to his asylum application, including several newspaper articles describing his grandfather's brutal murder. One editorial stated that Motielal's grandfather was "executed" because African leaders had portrayed him as a "prime example of the greedy acquisitive Indian who 'takes over' African ancestral lands and exploits Africans as the new 'Massa.'" Another article described how the Guyanese Black Panthers went on a "killing dance" against Indian people because they were taught racist things about these people. The record further contained two U.S. Department of State Country Reports on Guyana describing the longstanding racial tensions between the Indo-Guyanese and Afro-Guyanese and discussing the polarization along ethnic lines of Guyanese society.

After reviewing the evidence and finding that Motielal testified credibly, the IJ determined that Motielal had met his burden of proof for establishing asylum and withholding of removal. The IJ elaborated that Motielal had established past persecution and/or a well-founded fear of future persecution on account of his

Indo-Guyanese race and his wealthy Indo-Guyanese landowning social group. The IJ further found that Motielal established eligibility for CAT relief because the Afro-Guyanese police forces provided no protection. The IJ thus granted Motielal asylum, withholding of removal, and CAT relief.

On appeal by the government, the BIA found that Motielal was never physically harmed in Guyana and the incidents on which Motielal based his claims did not rise to the level of past persecution or past torture. The BIA also found that Motielal could not establish a well-founded fear of future persecution despite the racial tensions because (1) over five years had passed since Motielal left Guyana; (2) part of his family was safely living in Guyana; and (3) discrimination against Indo-Guyanese was not so pervasive as to give Motielal a well-founded fear of persecution.

In his petition, Motielal argues that: (1) the BIA was not sufficiently deferential to the IJ's findings; (2) the murder of his grandfather, the subsequent threats, and the attempted kidnaping of his cousin constituted past persecution; and (3) the BIA did not give sufficient weight to the Country Reports and submitted newspaper articles, which described racial tensions between the Indo- and Afro-Guyanese. Motielal also argues that he had a well-founded fear of future persecution because of: (1) racial tensions; (2) police ineffectiveness and obstructionism when his grandfather was kidnaped; and (3) his cousin informing

5

him, when Motielal fled to Trinidad, that people still were looking for him in

Guyana.[1]

## II.  STANDARD OF REVIEW

Because in this case the BIA did not expressly adopt the IJ's decision, we

review only the BIA's decision.  *See Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284

(11th Cir. 2001) (citation omitted).  We review factual determinations under the

substantial evidence test and will "affirm the BIA's decision if it is supported by

reasonable, substantial, and probative evidence on the record considered as a

whole."  *Id.* (internal quotations and citations omitted).  Therefore, we will reverse

a finding of fact "only when the record compels a reversal; the mere fact that the

record may support a contrary conclusion is not enough to justify a reversal of the

administrative findings."  *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir.

2004) (en banc) (citations omitted).

## III.  DISCUSSION

To be eligible for asylum, an alien must prove that he is a refugee, which is

---

[1] Because Motielal's brief addresses only his asylum claim and does not set forth an argument regarding withholding of removal and CAT relief, these issues are deemed abandoned. *See Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam).  In addition, Motielal's argument that the BIA was not sufficiently deferential to the IJ is meritless because the BIA reviews *de novo* "the application of legal standards [to factual determinations], such as whether the facts established by an alien amount to past persecution or a well-founded fear of persecution." *Matter of A-S-B*, 24 I. & N. Dec. 493, 496 (BIA 2008) (internal quotations omitted).   Finally, the BIA also found that no pattern or practice of discrimination against the Indo-Guyanese exists, but Motielal has not raised this issue on appeal.

6

defined by the INA as:

> any person who is outside any country of such person's nationality . . .
> and who is unable or unwilling to return to, and is unable or unwilling
> to avail himself or herself of the protection of, that country because of
> persecution or a well-founded fear of persecution on account of race,
> religion, nationality, membership in a particular social group, or
> political opinion . . . .

8 U.S.C. § 1101(a)(42)(A). An asylum petitioner must establish a nexus between the feared persecution and a statutorily listed factor and present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of" the statutorily listed factor. *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation omitted). However, the alien does not need to prove that he would be "singled out" for persecution if (1) there is a "pattern or practice" of persecution against similarly situated individuals and (2) his or her inclusion within that group of individuals makes fear of persecution reasonable. *See* 8 C.F.R. § 208.13(b)(2)(iii). If an applicant establishes past persecution, there is a presumption of a well-founded fear of future persecution that can only be rebutted by a showing of either "(1) that conditions in the country have changed, or (2) that the applicant could avoid future persecution by relocating within the country . . . ." *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1007 (11th Cir. 2008) (citations omitted).

An applicant who cannot demonstrate past persecution still can obtain

asylum if he shows that he has a well-founded fear of future persecution. *Id.* (citing 8 C.F.R. § 208.13(b)(2)). To establish a well-founded fear of future persecution, an applicant must demonstrate that he has: "(1) a subjectively genuine and objectively reasonable fear of persecution that is (2) on account of a protected ground." *Id.* The subjective prong is satisfied "by the applicant's credible testimony that he or she genuinely fears persecution," and the objective prong is satisfied if the applicant establishes that he "has a good reason to fear future persecution." *Id.* (internal quotations and citations omitted).

Although the INA does not define persecution, we have described persecution as an "extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation." *Sepulveda*, 401 F.3d at 1231 (quotations omitted). Menacing telephone calls and verbal threats, without more, do not amount to persecution. *Id.* Yet "[w]e have . . . rejected a rigid requirement of physical injury, making clear . . . that attempted murder is persecution, regardless of whether the petitioner was injured." *De Santamaria*, 525 F.3d at 1008 (internal quotations and citation omitted). "In determining whether an alien has suffered past persecution, the IJ must consider the cumulative effects of the [persecutory] incidents," instead of viewing each incident in isolation. *Delgado v. U.S. Att'y Gen.*, 487 F.3d 855, 861 (11th Cir. 2007) (per curiam) (citation omitted).

Here, the record as a whole compels a determination that Motielal suffered

past persecution; the evidence shows that the mistreatment he suffered was easily "more than a few isolated incidents of verbal harassment or intimidation." *Sepulveda*, 401 F.3d at 1231 (internal quotation omitted). Specifically, Motielal's undisputed, consistent, and detailed testimony about his grandfather's murder (which is further supported by his application documents), the verbal threats to his family, his cousin's kidnaping (in which his cousin was mistaken for Motielal, the petitioner himself), and the government's refusal to assist based on racial motivation, cumulatively compels a finding that Motielal suffered past persecution. Motielal need not "have suffered serious physical injury when there are physical threats combined with other forms of mistreatment such as kidnaping or attempted murder." *Moncada v. U.S. Att'y Gen.*, 287 F. App'x 842, 844 (11th Cir. 2008) (per curiam) (citation omitted). Further, "we may consider a threatening act against another as evidence that the petitioner suffered persecution where that act concomitantly threatens the petitioner." *Id.* (citing *De Santamaria*, 525 F.3d at 1009 n.7) (internal quotation marks omitted).

In finding no past persecution, the extent of the BIA's reasoning was that Motielal was never physically harmed and Motielal "failed to establish that these threats rise to the level of past persecution." The BIA's decision overlooked record evidence that Motielal's cousin was kidnaped because the kidnappers mistook him for Motielal, and further ignored the evidence that the Afro-Guyanese law

9

enforcement were inadequate and ineffective in protecting him or his family. Indeed, one newspaper article about the grandfather's execution discussed that despite the number of witnesses to the grandfather's kidnaping (which occurred in broad daylight as the grandfather ate lunch with his employees), no witness had identified the kidnappers and the police had made no arrest. Motielal's testimony also established that he would be "singled out" because he paid the workers' weekly salaries and everyone knew him by face.

The BIA failed to make a reasoned decision that considered the cumulative effect of the grandfather's murder, the threatening phone calls, the threat relayed by Motielal's cousin, the mistaken kidnaping of his cousin, and the lack of protection from law enforcement. The record compels the conclusion that these events cumulatively amount to past persecution and that this persecution was on account of Motielal's race and social group. And because Motielal established past persecution, he is entitled to a rebuttable presumption of future persecution. It does not appear that the government offered any evidence, or that the BIA made any finding, about changed country conditions or possible relocation. *See Moncada v. U.S. Att'y Gen.*, 177 F. App'x 36, 38 n.4 (11th Cir. 2006) (per curiam) (noting that where a petitioner demonstrates past persecution, the burden shifts to the government to establish by a preponderance of the evidence that the petitioner could avoid future persecution through relocation within his country of origin and

that it would be reasonable for the petitioner to do so).

Because substantial evidence did not support the BIA's decision that Motielal did not suffer past persecution, we vacate and remand to the BIA for further proceedings consistent with this opinion.

**PETITION GRANTED**.