[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 26, 2010
JOHN LEY
CLERK

No. 09-12661
Non-Argument Calendar

_____

Agency Nos. A089-327-441, A089-327-438

ERNESTO ARMANDO ROMERO VALENCIA,
DILIA CLEMENCIA SALAZAR AGUDELO,
CAMILO ROMERO SALAZAR,
KAREN JHOANA ROMERO SALAZAR,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(February 26, 2010)

Before CARNES, HULL and ANDERSON, Circuit Judges.

PER CURIAM:

Ernesto Armando Romero Valencia ("Romero") petitions for review of the Board of Immigration Appeals's ("BIA") dismissal of his appeal from the Immigration Judge's (IJ) order denying his application for asylum.[1] Romero, a citizen of Colombia, argues that the IJ and the BIA erred in concluding that death threats he received from members of the Colombian Revolutionary Armed Forces ("FARC") after he retired from the Colombian National Police did not constitute past persecution and that he did not have a well-founded fear of future persecution.[2] After review, we deny the petition.

To establish eligibility for asylum, an applicant must show either past persecution on account of a statutorily listed factor or a well-founded fear of persecution on account of that factor. 8 C.F.R. § 208.13(a), (b); Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). A finding of past persecution creates the presumption of a well-founded fear of persecution and shifts the burden to the government to demonstrate that either conditions have changed in the

---

[1] Romero's asylum application lists as derivative applicants Romero's wife, Dilia Clemencia Salazar Agudelo, and their children, Camilo Romero Salazar and Karen Jhoana Romero Salazar. Although we refer to Romero because he is the lead petitioner, our opinion applies equally to his family.

[2] Romero's application also sought withholding of removal and relief under the Convention Against Torture ("CAT"). In his petition for review, Romero does not address the IJ's denial of his CAT claim and makes only a passing reference to the IJ's denial of his request for withholding of removal. Accordingly, we address only the denial of Romero's claim for asylum. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (explaining that when a petitioner fails to offer argument on an issue or makes only passing references to it, the brief is insufficient to raise a claim and the issue is abandoned).

applicant's home country or the alien could avoid persecution by relocating in the home country and that relocation is reasonable. 8 C.F.R. § 208.13(b)(1).

Although the Immigration and Nationality Act does not define persecution, this Court has recognized that "persecution is an extreme concept requiring more than a few isolated incidents of verbal harassment or intimidation." Ruiz v. Gonzales, 479 F.3d 762, 766 (11th Cir. 2007) (quotation marks omitted). As such, "mere harassment does not amount to persecution." De Santamaria v. U.S. Att'y Gen., 525 F.3d 999, 1008 (11th Cir. 2008). Threats, even when coupled with brief detentions and minor physical attacks, do not rise to the level of persecution. See, e.g., Djonda v. U.S. Att'y Gen., 514 F.3d 1168, 1171 (11th Cir. 2008) (36-hour detention, beating and threat of arrest); Zheng v. U.S. Att'y Gen., 451 F.3d 1287, 1288-89 (11th Cir. 2006) (5-day detention). Thus, threatening phone calls, without more, do not constitute persecution. See Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1237-38 (11th Cir. 2006); Sepulveda, 401 F.3d at 1231.

Before the BIA and in his petition to this Court, Romero based his persecution claims on the FARC's actions after he retired from the police force in early December 2005. Here, we cannot say the evidence compels a conclusion that the FARC's actions against Romero after his December 2005 retirement amounted to persecution. According to Romero's asylum application; his hearing testimony, which the IJ credited; and his supporting evidence, Romero worked as an officer in

3

the Colombian National Police for 22 years, some of that time working in anti-narco-terrorist units. In 1991, Romero was shot by a FARC member while supervising a police blockade and his leg was wounded. Afterward, Romero began receiving death threats from the FARC. He twice transferred to different cities, but the threats continued sporadically. In the calls, the FARC would threaten to kill him and his family.

In June 2005, the death threats increased to the point that Romero decided to retire early. On December 8, 2005, a few days after he retired, his cousin, who was also a police officer and had received FARC death threats, was shot and killed while on active duty.[3] Before his cousin's death, his cousin's mother had received a particularly threatening call in which the FARC threatened to kill not only the cousin, but also Romero and his family.

After his retirement in early December 2005, Romero received

_____

[3]In a sworn statement, a police officer who worked with Romero averred that he was working on the night Romero's cousin, Gonzalo GuerreroValencia, was killed and heard on the radio that the cousin had been "cruelly assas[s]inated while working as a policeman in the city of Cali." In a sworn statement, the cousin's mother stated that her son was "despicably shot to death and murdered on December 8, 2006 [sic] in the City of Cali while he was in active duty as a policeman." She states that "[i]n [her] heart as a mother and the incidents gear towards the members of the FARC guerrilla as the authors of this crime" because her son had mentioned he was receiving threats from the FARC. A Cali newspaper article dated December 11, 2005 states that "[t]he militia of the guerrilla groups" are the main suspects in the killing of two police officers, one of who is identified as Gonzalo Guerrero Valencia. According to the article, the officers were on patrol when they were "surprised by armed men" who fired at them repeatedly and then left the scene. The Police Chief offered a reward for information as to "the authors of these crimes," and stated that the police "cannot discard the possibility that this was the action of militias who are present in the area . . . ."

4

approximately twenty threatening phone calls from the FARC. The callers indicated that even though Romero had retired, he was "the next one in line to be . . . assassinated by them." In January 2006, Romero received a call from the FARC at his home, in which the FARC stated, "[Y]ou are next." As a result, on January 19, 2006, Romero sent his daughter to the United States to stay with an aunt. On June 14, 2006, Romero, his wife and son also entered the United States. Romero did not present any evidence of threats after January 2006.

The record contains: (1) documentation of Romero's employment with the police force as an anti-guerilla officer and his injuries suffered during the 1991 shooting incident; (2) Romero's cousin's death certificate indicating the cousin died in Cali on December 8, 2005, but giving no details as to the cause of death; and (3) the newspaper article reporting the shooting of Romero's cousin. The record also contains the U.S. State Department's 2007 Country Report on Human Rights Practices in Colombia ("2007 Country Report"), stating, inter alia, that: (1) human rights abuses in 2007 included killings of off-duty members of public security forces; (2) the FARC continued its practice of kidnapping members of the security forces for use as pawns in prisoner exchanges; (3) between January and October, FARC guerillas killed 65 members of the public security forces; (4) the FARC regularly abused its targets' family members; (5) many Colombians went into self-imposed exile due to FARC threats; (6) there were approximately 9,500

5

FARC members throughout Colombia, but its group force levels continued to decline.

As noted earlier, before the BIA and in his petition to this Court, Romero based his persecution claims on his experiences with the FARC after he retired from the police force in early December 2005. See In re Fuentes, 19 I. & N. Dec 658, 661-62 (BIA 1988) (concluding that attacks against active members of the police force do not constitute persecution on account of a protected ground, but recognizing that mistreatment because of one's status as a former police officer may "in appropriate circumstances" be persecution on account of political opinion or membership in a particular social group). The BIA concluded that the post-retirement threats Romero received did not amount to persecution. We agree.[4]

Over a two-month period between December 2005 and January 2006, Romero received approximately twenty threatening calls from the FARC. However, there is no evidence the FARC ever attempted to carry out their threats or even confronted Romero personally. Furthermore, after receiving his last threat

---

[4]"We review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion." Al Najjar, 257 F.3d at 1284. "Insofar as the [BIA] adopts the IJ's reasoning, we will review the IJ's decision as well." Id. Here, because the BIA wrote a separate opinion that independently analyzed whether the FARC's actions against Romero amounted to past persecution, we review only the BIA's decision as to this ruling. Because the BIA agreed with the IJ's reasoning as to Romero's claim of future persecution, we review both the BIA's and the IJ's decisions as to this claim. We review a factual determination that an alien is statutorily ineligible for asylum under the substantial evidence test. Id. at 1283. Under the substantial evidence standard, "we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen, 327 F.3d 1283, 1287 (11th Cir. 2003).

6

in January 2006, Romero stayed in Colombia for another five months without incident before leaving for the United States. Under our precedent, harassment such as telephone threats, without more, does not constitute persecution. See Sepulveda, 401 F.3d at 1231.[5]

Substantial evidence also supports the BIA's determination that Romero failed to demonstrate a well-founded fear of future persecution. To show future persecution, an alien "must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289. Further, "[a]n alien cannot demonstrate that [he] more-likely-than-not would be persecuted on a protected ground if the [BIA] finds that the alien could avoid a future threat by relocating to another part of [his] country." Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006) (quotation marks omitted); see 8 C.F.R. § 208.16(b)(2).

Here, the FARC actions against Romero after December 2005 never escalated beyond telephone threats, Romero remained in Colombia an additional five months without incident after the FARC told him he was next, and Romero presented no evidence that since January 2006 the FARC has looked for him,

---

[5]Because we conclude that substantial evidence supports the finding that the post-retirement threats Romero received from the FARC do not constitute persecution, we do not address Romero's arguments that as a former police officer he is a member of a particular social group and that he could not relocate within Colombia to avoid persecution.

7

threatened him, or threatened his family remaining in Colombia.

Although Romero's cousin, who also received FARC threats, was shot by armed men while patrolling as a police officer, there is no evidence as to the identity of these armed men. While the police suspected militias in the area may have been involved, they offered a reward for information as to the armed men's identity. Thus, Romero's belief that his cousin was killed by the FARC appears to be based more on speculation than evidence. Furthermore, even assuming Romero's cousin was shot by the FARC, he was on active duty at the time. Similarly, while the 2007 Country Report indicates that the FARC kidnap and kill public security forces, including those that are "off-duty," the report says nothing about the risks to retired police officers. Thus, neither his cousin's death nor the 2007 Country Report compels a conclusion that Romero himself may suffer persecution if he returns to Colombia.

For these reasons, substantial evidence supports the BIA's finding that Romero is statutorily ineligible for asylum.

**PETITION DENIED.**