[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 25, 2011
JOHN LEY
CLERK

No. 10-12339
Non-Argument Calendar

_____

Agency No. A098-610-703


ERWIN KORNIAWAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(January 25, 2011)

Before TJOFLAT, CARNES and FAY, Circuit Judges.

PER CURIAM:

Erwin Korniawan, a native and citizen of Indonesia, petitions for review of the denial of his application for asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), 8 U.S.C. §§ 1158, 1231(b)(3); 8 C.F.R. § 208.16. He argues that the Board of Immigration Appeals ("BIA") erred in determining that he had failed to prove that he was persecuted on the basis of his Chinese ethnicity. He further argues that the BIA erred in concluding that he had failed to prove that he was more likely than not to be tortured with the acquiescence of the Indonesian government. For the reasons set forth below, we deny the petition for review.

I.

Korniawan entered the United States in 1996 on a nonimmigrant F1 visa, later adjusting his status to H1B1 and obtaining authorization to remain until May 2004. In 2007, he was served with a Notice to Appear that charged him with overstaying his visa, in violation of INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). He admitted the allegations and conceded removability.

Korniawan sought asylum, withholding of removal, and CAT relief on the basis of alleged persecution he had experienced on the basis of his Chinese ethnicity. He noted that ethnic Chinese Indonesians are subjected to official and

unofficial harassment in Indonesia, and the ongoing economic crisis and political instability have led to mob attacks by native Indonesians on ethnic-Chinese-owned businesses and institutions.

In his application and his testimony at the asylum hearing, Korniawan described four of his own experiences. In 1986, he participated in an annual walk-a-thon commemorating Indonesian Independence Day. About two hours into the walk, native-Indonesian participants began to harass and mock the ethnic Chinese participants. He was repeatedly called "Cino," an ethnic slur. Some spectators spat on him, while others threw small rocks and water balloons at him. One person smacked him in the head, and several adults touched his buttocks and genital area. His teammates—employees of his parents' business who were mostly native Indonesians—tried to protect him. The conduct continued sporadically throughout the six-hour event. Some of the harassment occurred near the checkpoints where police officers were stationed, but no officers intervened.

In 1990, Korniawan was riding a motorcycle home from school when a motorcycle gang stopped him and said, "Hey, Cino, give me some money or I beat you up." When he said that he did not have any money, one of the gang members swung a baseball bat at him but missed. Korniawan sped away, but they chased him. He drove for approximately ten miles before he lost them and was able go

home.

In 1991, Korniawan was on his way to a tutoring session when a group of five native Indonesian men approached him and said, "Hey, Cino, give me your money! If you don't give me, I will hurt you." One of the men yelled, "Don't even try to lie to us for not having any money! We know you Chinese people are rich!" The man took a sickle from under his shirt and pointed it at Korniawan, then threatened him again. Korniawan gave the men his wallet, but it contained only a small amount of money, so one of the men said, "Oh, too bad, if that's the case, then we might just have to kill you as well! One less Chinese person in this country!" Korniawan fled, but he could hear the men yelling that they would come to his boarding house and harm his schoolmates and host family. He became afraid to be outdoors by himself, so he asked his tutor to start coming to his house, and he greatly limited his after-school activities. A schoolmate told him that one of their friends had recently been robbed by a member of the Indonesian military, and they speculated that the same man might have been involved in the robbery of Korniawan.

Finally, in 1992, Korniawan and a group of his ethnic-Chinese friends were walking outside and trying to decide whether to hire becaks (three-wheeled vehicles) or to take public transportation. Native-Indonesian becak drivers called

out to offer their services, but the group decided to take a bus and did not respond to the drivers. The drivers became upset and approached the group as if to start a fight. One of the drivers said, "Cino, bastard, dog," and another punched Korniawan. The group fled and boarded a bus. After that incident, Korniawan rarely left his boarding house or did anything outdoors. Korniawan and his family decided not to report any of these incidents to the police, as his parents' experience had shown them that the police would not do much and would ask for bribes.

Korniawan testified that he was afraid to return to Indonesia because of discrimination, potential threats, and local officials' failure to adhere to the national government's anti-discriminatory changes to regulations. He said that he had not been physically harmed by any of the incidents he had experienced, but he feared that "it[ was] just a matter of time" before he would be physically harmed. He also described government officials' continuing extortion of bribes from the ethnic Chinese in exchange for processing permits and licenses and providing police services, and he said that, because of this ongoing discrimination, he did not believe that the government would protect him from harm by native gangs. Nevertheless, he acknowledged that his mother had not been harmed in the 1997 and 1998 riots against the ethnic Chinese, and he said that his family had owned a

successful business since 1974, for which they had been able to obtain the necessary permits.

The Immigration Judge ("IJ") denied all of Korniawan's requests for relief and ordered him removed to Indonesia. He found Korniawan's testimony to be credible, but concluded that Korniawan had generally complained of only harassment and intimidation. The treatment he had experienced did not rise to the level of persecution, and he feared experiencing only harassment and discrimination in the future, which failed to establish a well-founded fear of future persecution. As Korniawan had not met the standard for asylum, he also had not met the higher standard for withholding of removal. Finally, the evidence did not establish eligibility for CAT relief.

Korniawan appealed to the BIA, which dismissed his appeal. It found that he had testified to mistreatment on a limited number of occasions many years ago, none of which involved serious injury or a lasting impact, and he had not reported them to police because the police would ask for money. As persecution does not include all forms of mistreatment and harassment, Korniawan had not shown past persecution. Consequently, he also had failed to establish eligibility for withholding of removal. Finally, Korniawan had not shown governmental acquiescence in the mistreatment he had experienced, and he had not submitted

6

any evidence showing that he was more likely than not to be subject to torture to which the government would acquiesce. Thus, he was ineligible for CAT relief.

## II.

We review the BIA's decision, except to the extent that it expressly adopts the IJ's opinion or relies upon its reasoning. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). Here, the BIA wrote a separate, brief opinion that independently analyzed Korniawan's claims, and, thus, we review only that opinion. "We will not reverse unless the record compels a contrary conclusion." *De Santamaria v. U.S. Attorney Gen.*, 525 F.3d 999, 1006 (11th Cir. 2008). Factual determinations are reviewed under the substantial evidence test, which requires us to "view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (*en banc*). "We must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 1027 (quotation marks omitted).

## III.

To establish eligibility for asylum based on past persecution, the applicant must prove (1) that he was persecuted, and (2) that the persecution was on account

of a protected ground. *De Santamaria*, 525 F.3d at 1007. To meet the more stringent standard for withholding of removal under the INA, the alien must show that his "life or freedom would be threatened" in the country of removal on the basis of a protected ground. *Sepulveda v. U.S. Attorney Gen.*, 401 F.3d 1226, 1232 (2005). Thus, "[t]he alien bears the burden of demonstrating that it is more likely than not [he] will be persecuted or tortured upon being returned to [his] country." *Id.* (quotation marks omitted). An alien who cannot meet the standard for asylum generally cannot satisfy the higher more-likely-than-not standard for withholding of removal. *Id.* at 1232-33.

"[P]ersecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and . . . mere harassment does not amount to persecution." *De Santamaria*, 525 F.3d at 1008 (quotation marks omitted). Although we do not rigidly require physical injury, *id.*, "minor physical abuse and brief detentions do not amount to persecution," *Kazemzadeh v. U.S. Attorney Gen.*, 577 F.3d 1341, 1353 (11th Cir. 2009).

Korniawan testified to four incidents that occurred over a six-year period. During the walk-a-thon, some native Indonesians spat on him and used racial slurs, others threw small rocks and water balloons at him, one person smacked his head, and several adults touched his buttocks and genital area. During the first

8

robbery, the motorcycle gang used a racial slur, one member swung a bat at him when he said that he did not have any money to give them, and they chased him when he sped away. During the second robbery, the men used racial slurs and one threatened him with a small sickle. When he gave them only a small amount of money, they threatened to come to his boarding house in order to kill him and harm his friends, but Korniawan did not testify that he experienced any further problems with the men. During the final incident, a becak driver used a racial slur and another punched Korniawan when Korniawan and his friends decided to take a bus rather than hire them. Korniawan was not physically harmed by any of the incidents. On the whole, substantial evidence supports the BIA's conclusion that these incidents constituted harassment and discrimination, but not persecution. *See De Santamaria*, 525 F.3d at 1008; *Adefemi*, 386 F.3d at 1026-27. Accordingly, Korniawan failed to establish eligibility for asylum or withholding of removal. *See De Santamaria*, 525 F.3d at 1007; *Sepulveda*, 401 F.3d at 1232-33.

IV.

"In order to prevail on a claim for CAT relief, an alien must demonstrate it is more likely than not that []he will be subjected to pain and suffering at the hands or acquiescence of the government." *Lapaix v. U.S. Attorney Gen.*, 605 F.3d 1138, 1145 (11th Cir. 2010). "Government acquiescence is the key distinguishing factor

9

between" a CAT claim and an asylum claim. *Id.* Korniawan testified that he never reported any of the four incidents to the police, and he did not indicate that he knew any government officials to have been involved in the incidents. He recalled only that some of the harassment during the walk-a-thon occurred near the checkpoints where police officers were stationed, and that he and a schoolmate had speculated that one of the men involved in the second robbery might have been in the military. The fact that the Indonesian government engages in legal discrimination against the ethnic Chinese does not demonstrate that it would support or engage in torture of those individuals. On the whole, substantial evidence supports the BIA's conclusion that Korniawan failed to prove that the Indonesian government would participate in or acquiesce to any acts of torture to which he might be subjected. *See Lapaix*, 605 F.3d at 1145; *Adefemi*, 386 F.3d at 1026-27.

For the foregoing reasons, we deny the petition for review.

**PETITION DENIED.**