[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 16, 2011
JOHN LEY
CLERK

No. 10-14187
Non-Argument Calendar

_____

Agency No. A96-486-390


FARRUKH BOBOKALONOV,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(May 16, 2011)

Before BARKETT, WILSON and FAY, Circuit Judges.

PER CURIAM:

Farrukh Bobokalonov, a native of Tajikistan and citizen of Russia, petitions

for review of the denial of his application for asylum, withholding of removal

under the Immigration and Nationality Act ("INA"), and relief under the

Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment

or Punishment ("CAT"). 8 U.S.C. §§ 1158, 1231(b)(3); 8 C.F.R. § 208.16. He

argues, first, that his administrative remedies with respect to the CAT claim should

be deemed exhausted and, thus, we should exercise jurisdiction to review the

merits of the claim. He further argues that the Board of Immigration Appeals's

("BIA") adverse credibility determination was not supported by substantial

evidence.[1] For the reasons set forth below, we dismiss the petition with respect to

the CAT claim and deny the petition with respect to the asylum and withholding-

of-removal claims.

## I.

Bobokalonov entered the United States in May 2002 on a J-1 exchange

visitor visa. In 2006, he was served with a Notice to Appear alleging that he had

---

[1] In addition, Bobokalonov argues that the BIA incorrectly held that the REAL ID Act of 2005 applied to his claim and, thus, incorrectly applied the REAL ID Act's totality-of-the-circumstances standard to his credibility determination rather than a heart-of-the-claim standard. Bobokalonov is correct that his claim is not governed by the REAL ID Act, which became effective in May 2005, approximately two years after he filed his application. *See* Pub. L. No. 109-13, § 101(h)(2), 119 Stat. 305. Yet, as discussed below, Bobokalonov's credibility determination satisfies either standard. Therefore, the BIA's misstatement of the law was harmless, and we decline to address the novel question of whether the totality-of-the-circumstances or heart-of-the-claim standard should apply to claims initiated prior to the effective date of the REAL ID Act.

overstayed his visa and charging him under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). He admitted the allegations and the Immigration Judge ("IJ") sustained the charge of removability.

In 2003, Bobokalonov applied for asylum on the basis of his religion. He stated that he was born in Tajikistan and was Muslim by birth, though he did not practice the religion. He alleged that his father had refused to fight on the side of either of two Muslim groups during Tajikistan's civil war in the 1990s, so the groups put the Bobokalonov family on a list of people to be killed. The family obtained refugee status in Russia in 1991. However, the people from Tajikistan had found the family in Russia and were trying again to kill them. In the past few years, people had come to the family's house in Russia and shot at it with various kinds of weapons, but no one had been killed yet.

In 2006, Bobokalonov prepared a typed statement in support of his asylum application. He stated that he and his family lived in Tajikistan until 1992, the year in which civil war broke out. The war was characterized by bloody revenge, vendettas, and "liquidation" of political figures and their families. A mullah with power in the government made a list enumerating all active political figures and members of two opposition parties, who were denounced as enemies of the people. The opposition was based in the Kuibishev district, where Bobokalonov's family

lived, and his uncle, Anvar, was active in one of the opposition groups. Anvar's activity caused him and his relatives, including Bobokalonov's family, to be placed on the mullah's list. In May 1992, the entire extended family left for Dushanbe, the capital. When Anvar checked Bobokalonov's grandmother's house to make sure everyone had left, he found that the house had been attacked. Mirrors were broken and the walls had been shot with guns. After arriving in Dushanbe, Anvar left in search of more family members. After hearing nothing from him for eight years, Bobokalonov's family learned that Anvar had migrated to Afghanistan and had been killed when trying to return home to Tajikistan. As the war spread throughout Tajikistan, the family had no choice but to migrate to Russia in December 1992. The government forces eventually won the civil war, and the opposition members and the people on the mullah's list became social outcasts who had difficulty finding work.

Bobokalonov further stated that his mother was unable to find employment in Russia, and the benefits his father received as a forced immigrant were not enough to support the entire family. After graduating from high school, Bobokalonov moved to a large city to attend the university. There, aggressive gangs of teenage radicals had real power and the support of the general population. Those groups were very dangerous to immigrants from Central Asia.

4

One of the most serious extremist groups, the skinheads, had huge support among young people. When Bobokalonov had the opportunity to travel to the United States, he took it immediately. He added that, in May 2005, his sister was cruelly beaten at a bus station. The only explanation given by the participants was that one of the men could not find a job because of "this kind of people."

In support of his application, Bobokalonov submitted the U.S. State Department's 2008 Country Report on Russia, which stated that there was some governmental discrimination and widespread societal discrimination, as well as racially motivated attacks, against ethnic minorities and dark-skinned immigrants or guest workers. There was a steady rise in xenophobic, racial, and ethnic attacks and hate crimes, particularly by skinheads, nationalists, and right-wing extremists. The report particularly described violence and discrimination against Tajik workers and other immigrants from Central Asia and the Caucasus, and the fact that police often failed to record infractions against minorities or to issue a written record to the alleged perpetrators.

At the asylum hearing, Bobokalonov testified that his mother and older sister were residing in the United States, whereas his younger brother and sister remained in Russia. He stated that it was dangerous for him to be in Russia due to "a series of events" that had happened there. He testified that he was nine years

old in 1992 when the family immigrated from Tajikistan to Russia. His uncle was active in politics, and his father helped his uncle. The family left Tajikistan because of the civil war, and because oppression of the opposition made it dangerous for his uncle and the family to stay. Bobokalonov became a Russian citizen and carried a Russian passport. He did not want to return to Russia because of the nationalist groups that surfaced while he was in high school. He had experienced physical fights and violence, which did not have any consequences for the perpetrators. He had to go to the hospital at least five times.

He testified that he experienced the first violent incident in 1998, when he was in tenth grade. He was leaving school when a large group of people on the street approached him and started asking questions about his mother in order to provoke a fight. He recognized three fellow students who were participants in the new skinhead movement. The people hit him in the face and elsewhere on his body, knocking him off his feet. He did not seek treatment after this incident, and he did not report it to the authorities, as he thought it was just an ordinary fight.

In February 1999, when Bobokalonov was in eleventh grade, people beat him, insulted him, and said that it was high time for him to go back to his motherland. He was hospitalized for one or two days for a concussion. He said that he reported the incident to the authorities and that some other fights happened

6

in the presence of authorities. When he asked authorities whether they could help and whether he had grounds to open up a case, they would tell him that the criminal had disappeared and could not be found. The fights continued and he had to seek treatment at hospitals, but the police refused to protect him.

Bobokalonov also recalled an occasion in 2000, just before he enrolled at the university, when people pushed him off a staircase. His leg was not broken, but it was very seriously bruised and required an operation. He was in the hospital for two days and had to stay at home for two or three weeks. He reported the incident to the police, but he was told that there was no criminal offense because he could have merely fallen off the staircase. He testified that these were the "most vivid" incidents, but "there were too many incidences of oppression and physical violence" to be able to enumerate them. He constantly heard people talking about him, either in class or on the street, and saying that it was time for him to "go back."

Bobokalonov added that, when he was in high school, the skinhead movement was only just starting and skinheads treated the movement like a hobby or lifestyle. Around the time he went away to university, skinhead groups became more serious and organized. There was no violence directed at his parents. Other members of his family got into fights, but none as serious and traumatic as he had

7

experienced during high school.  He was afraid to go back to Russia because he did not think he would survive for a month, due to the increase in armed, officially registered groups that seek to purge Russia of immigrants from Central Asia.

Bobokalonov further testified that his younger sister, Madina, worked as an interpreter in Russia.  Because she was hired for that position over other candidates who belonged to skinhead groups, she was attacked in the street as she left a class at the university.  She was beaten and suffered serious injuries, including a concussion, which required her to be hospitalized briefly.  When security guards arrived at the scene, the attackers told the guards that Russians do not have jobs because of people like Madina.  Bobokalonov also said that his brother, a professional chess player, competed in a tournament for the opportunity to come to the United States.  His brother defeated a player who belonged to a nationalist group.  Because he had deprived that player of the trip, the brother was beaten severely and his kidneys were injured.  He was hospitalized for two weeks.

When asked on cross-examination why he had not mentioned the attacks and hospitalizations in his original asylum application, Bobokalonov said that the statement was written down by a paralegal.  He told his story to the paralegal, who just wrote what the paralegal thought was important.  Bobokalonov acknowledged that he speaks fluent English himself, so he would have known what he was

submitting with the application, but he said that he signed it without reading it because he assumed that the paralegal had written down everything he said. He indicated that he had prepared the typed supplemental statement, which he took to his asylum interview, by himself.

Bobokalonov reiterated that his first beating occurred during high school. He sought medical treatment by himself for the attacks during high school, but an attack at the university was the first occasion that required others to take him to a hospital. His longest period of hospitalization occurred in Winter 2002. The 2002 incident was the main reason that he took part in the exchange program. As he walked from the university to a train station, he went through an underground crossing, where groups of people blocked his way and asked him questions that were intended to provoke a fight. During the fight, he suffered some sort of brain injury. He did not remember how he got to the hospital, but he knew "they" took him there. He spent approximately a month in the hospital.

Bobokalonov stated that his brother's victory in the chess tournament was only a pretext for the beating. If someone else had won, that person would not have been beaten. He added that the family began to discuss moving back to Tajikistan in 1994 or 1995. News of Anvar's death in 2001 caused the family to decide not to return to Tajikistan. Bobokalonov added that he cannot return to

Tajikistan because, during the civil war, two Russian peacekeeping divisions were shot by government troops. Since that time, relationships between the countries and within Tajikistan had deteriorated.

Bobokalonov testified that he was in regular contact with his mother and older sister, who are in the United States, but that he had not asked them to write letters describing what happened to him in Russia. He said that he had tried for six years to obtain copies of his medical records, but that the older records did not exist because a Russian citizen obtains a new medical-history booklet when he moves from one city to another. He had obtained a note or certificate that he was beaten while at the university, but he had not brought that note with him to the United States and it was problematic to obtain a copy. Whenever he had tried to file a police report or to take legal action against his attackers, he was always told that there was no criminal offense or that he should go back to his country.

The IJ noted that the bulk of the typed statement discussed the Tajikistan civil war, and he asked why the statement did not mention any of the incidents of beatings by skinheads. Bobokalonov said that the statement would have been six or seven pages long, and it was simpler just to tell the asylum officer about those incidents. The IJ also noted that Bobokalonov had told the officer that he had a copy of a newspaper report describing his younger sister's beating, and that the

10

officer had given him time to provide a copy, but Bobokalonov had not done so.

Bobokalonov told the IJ that the officer had given him time to produce his medical

records, but that the central medical facility had said they would need time to

search the archive. He also said that the newspaper report about his sister was

available online, as were the many comments on the article that proved the attitude

of Russians toward Central Asian immigrants, and that he could print out a copy

of the article at any time.

The IJ denied all of Bobokalonov's requests for relief and ordered him

removed to Russia, based on the finding that Bobokalonov's testimony was

incredible. The IJ noted major discrepancies among Bobokalonov's asylum

application, supplemental typed statement, asylum interview, and testimony. He

did not find it reasonable that Bobokalonov simply did not think it necessary to

mention the beatings in the statement as long as he mentioned them during the

interview and in court, and Bobokalonov had told the asylum officer and IJ that

the application was complete and correct. It was not reasonable that Bobokalonov

would not have told either the asylum officer or the court that he had deliberately

omitted from his application all of the information about the alleged attacks.

Further, Bobokalonov had told the asylum officer that he "was beaten a bunch and

it was no big deal," and that he "did not pay attention because it was a long time

11

ago." This explanation was not reasonable, but it suggested that Bobokalonov did not have much fear of returning to Russia. The IJ added that corroborating evidence "would have been helpful" in light of the weakness of Bobokalonov's testimony, but that he had failed to provide such evidence, and his testimony regarding his alleged hospital stays lacked specific detail about his injuries and the treatments he received.

On appeal, Bobokalonov argued *pro se* that he had testified credibly and, thus, had established past persecution. He asked the BIA to grant him asylum or withholding of removal under the INA.

The BIA stated that Bobokalonov's testimony was insufficiently detailed, consistent, or believable to provide a plausible and coherent account of the basis for his fears and, thus, required corroborating evidence. It referred to the IJ's finding of a lack of detail in Bobokalonov's testimony about his hospitalizations, including the treatment he had received and the injuries he had suffered. It found that this cast doubt on the credibility of his claim that he had suffered violence in the past or would suffer violence in the future. It further noted the inconsistencies between the original, handwritten application and statement, the typed supplemental statement, the asylum interview, and the testimony on events that were central to Bobokalonov's claim. In particular, it noted that Bobokalonov's

12

original application claimed only a fear of returning to Tajikistan. His supplemental statement primarily discussed a fear of returning to Tajikistan, and it only briefly mentioned his fear of the Russian skinheads without suggesting that he had been attacked in Russia. By contrast, he had told the asylum officer that he was physically attacked by skinheads 50 times. The BIA agreed with the IJ that it was not reasonable that Bobokalonov would have omitted information about the attacks from his statements simply because he intended to discuss his fear in the interview and in his testimony. The BIA also agreed that it did not seem reasonable that Bobokalonov would have failed to tell either the asylum officer or the IJ that he had deliberately omitted all of those details.

Additionally, the BIA found that Bobokalonov had failed to present sufficient corroborating evidence in support of his claim. He had not presented the alleged newspaper article about the attack on his younger sister, copies of his medical records, or statements by his mother and older sister, with whom he was in constant contact. Accordingly, he had not established eligibility for asylum or withholding of removal. Finally, the BIA concluded that Bobokalonov had not shown that he was more likely than not to be tortured by or with the acquiescence of the Russian government.

II.

13

Absent a cognizable excuse or exception, we lack jurisdiction to review an argument unless the petitioner has first exhausted his administrative remedies. *See Amaya-Artunduaga v. U.S. Attorney Gen.*, 463 F.3d 1247, 1250 (11th Cir. 2006). Where the BIA addresses an issue *sua sponte* that was not raised in the alien's notice of appeal or supporting brief, "we cannot say the BIA fully considered the petitioner's claims, as it had no occasion to address the relevant arguments." *Id.* at 1250-51. Accordingly, we lack jurisdiction to review such arguments. *See id.*

Bobokalonov's appeal to the BIA argued only that he had proved his claims for asylum and withholding of removal under the INA. He did not suggest that he had similarly proved his eligibility for CAT relief. Therefore, he failed to exhaust his administrative remedies with respect to the denial of CAT relief. *See Amaya-Artunduaga*, 463 F.3d at 1250-51. Although Bobokalonov asks us to depart from *Amaya-Artunduaga*, we cannot do so unless that case is overruled by the Supreme Court or by this Court sitting *en banc*. *See De la Rosa v. U.S. Attorney Gen.*, 579 F.3d 1327, 1337 n.14 (11th Cir. 2009), *cert. denied*, 130 S.Ct. 3272 (2010). Accordingly, we lack jurisdiction to review his claim for CAT relief.

## III.

We review the BIA's decision, except to the extent that the BIA expressly adopts the IJ's opinion or relies upon his reasoning. *Al Najjar v. Ashcroft*, 257

F.3d 1262, 1284 (11th Cir. 2001).  Here, the BIA wrote a separate opinion that concurred with the IJ's opinion but did not rely upon it.  Thus, we review only the BIA's decision.  Credibility determinations are reviewed under the substantial-evidence test, *Chen v. U.S. Attorney Gen.*, 463 F.3d 1228, 1230-31 (11th Cir. 2006), under which "we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision," *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (*en banc*).  "We must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 1027 (quotation marks omitted).  "We will not reverse unless the record compels a contrary conclusion." *De Santamaria v. U.S. Attorney Gen.*, 525 F.3d 999, 1006 (11th Cir. 2008).

To establish eligibility for asylum based on past persecution, the applicant must prove (1) that he was persecuted, and (2) that the persecution was on account of a protected ground. *Id.* at 1007.  To meet the more stringent standard for withholding of removal under the INA, the alien must show that his "life or freedom would be threatened" in the country of removal on the basis of a protected ground. *Sepulveda v. U.S. Attorney Gen.*, 401 F.3d 1226, 1232 (11th Cir. 2005).  "The alien bears the burden of demonstrating that it is more likely than

15

not [he] will be persecuted or tortured upon being returned to [his] country." *Id.* (quotation marks omitted). An alien who cannot meet the standard for asylum generally cannot satisfy the higher standard for withholding of removal. *Id.* at 1232-33.

Credible, uncorroborated testimony can be sufficient to satisfy the applicant's burden of proof of eligibility, whereas an adverse credibility determination alone can be sufficient to support a denial of asylum. *Ruiz v. U.S. Attorney Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006). Once the factfinder has made an adverse credibility determination, the applicant bears the burden of showing that the finding was not supported by specific, cogent reasons or was not based on substantial evidence. *Id.* If the applicant produces evidence in addition to his otherwise incredible testimony, the factfinder has a duty to review that evidence. *Id.* The weaker the applicant's testimony, the greater the need for corroborating evidence. *Yang v. U.S. Attorney Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005).

We may not substitute our judgment for that of the factfinder when reviewing credibility findings. *Ruiz*, 440 F.3d at 1255. "Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments." *Id.* We have held that an

adverse credibility determination was supported by substantial evidence where the applicant testified implausibly as to attacks on his home, there were numerous inconsistencies among the asylum application, testimony, and documentary evidence, and he failed to mention "a significant part of his claim" in his asylum application. *D-Muhumed v. U.S. Attorney Gen.*, 388 F.3d 814, 819 (11th Cir. 2004).

Bobokalonov's 2003 asylum application explicitly stated that he sought asylum solely on the basis of religion, specifically his Muslim heritage. It alleged that, as a result of his father's refusal to fight with either Muslim faction in the civil war, the family was placed on a list of people to be killed. He claimed that people from Tajikistan had recently found the family in Russia and resumed the attempt to kill them.

In his 2006 typed supplemental statement, Bobokalonov alleged that his uncle, Anvar, was active in the opposition, and it was Anvar's political activity that caused the family to be placed on the enemies list. The typed statement described the destruction of his grandmother's former home shortly after the family's evacuation for the capital, the family's eventual flight to Russia from the spreading civil war, and his parents' difficulty in supporting the family in Russia. The statement briefly mentioned that, in the city where his university was located,

17

aggressive groups of nationalists and skinheads had power and support, especially among young people, and that his sister was beaten at a bus station in May 2005 because one of the attackers blamed "this kind of people" for his inability to find a job.

At the 2009 asylum hearing, Bobokalonov testified that Anvar was active in Tajikistan politics, and that his father helped Anvar in those endeavors. He did not mention the civil war except to say, on cross-examination, that he could not return to Tajikistan because two Russian peacekeeping divisions were shot by Tajikistan troops during the war. He stated that he was afraid to return to Russia because of the nationalist groups that had surfaced while he was in high school, which sought to purge Central Asian immigrants. He said that he had to go to the hospital at least five times due to physical altercations with nationalists, and he described the three "most vivid" of those incidents, all of which occurred while he was in high school or just before he left for university. He noted briefly that the skinhead groups had grown in criminality and power around the time he went away to university. He described the attack on his younger sister as specific retribution for having secured the interpreter position over other candidates who happened to be skinheads, and he claimed for the first time that his brother had been attacked for defeating a chess opponent who also happened to belong to a

nationalist group. He indicated that both his brother and his sister suffered serious injuries that required hospitalization. On cross-examination, he mentioned for the first time that he was attacked at the university in 2002 and was hospitalized for a month due to a brain injury. He described this incident as the main reason that he took part in the exchange program that brought him to the United States.

Thus, over the course of the six-year application process, and within Bobokalonov's testimony on the day of the hearing, the asserted grounds for his asylum claim and his evidence in support of that claim changed dramatically. His assertion that he signed the paralegal's work on the original application without reading it is an unpersuasive explanation for the application's complete failure to assert a claim based on his Tajik nationality or to mention any violence by Russian nationalists, including the 2002 attack that he described as his main reason for leaving the country. It also fails to explain the change in the purported reasons for his family's presence on the enemies list and their flight to Russia, or to explain why he did not mention, at any later point in the proceedings, the purported attack on the family's Russian home by Tajik enforcers of the list. Furthermore, the inconsistencies among the application, typed statement, and testimony went to issues that were central to Bobokalonov's claim. Accordingly, substantial evidence supports the BIA's finding that Bobokalonov's testimony was incredible.

*See Chen*, 463 F.3d at 1230-31; *D-Muhumed*, 388 F.3d at 819.

The incredibility of Bobokalonov's testimony created a great need for corroborating evidence. *See Yang*, 418 F.3d at 1201. He introduced a copy of the Country Report, which generally verified that Russian nationalists have engaged in violence toward Central Asian immigrants, but he did not introduce any corroboration of his personal experiences. He stated only that the newspaper report about the attack on his sister was available online, and that when he asked for copies of his medical records, he was told that the archives would need to be searched. He did not explain why six years had been an insufficient amount of time to produce any of those documents, nor did he explain why he failed to obtain supporting statements from any of his family members. As Bobokalonov did not support his application with any evidence other than his incredible testimony and the general description of country conditions in the Country Report, the record does not compel the conclusion that Bobokalonov met his burden of proof of eligibility for asylum or withholding of removal. *See De Santamaria*, 525 F.3d at 1006; *Ruiz*, 440 F.3d at 1255; *Sepulveda*, 401 F.3d at 1232-33.

For the foregoing reasons, we dismiss the petition as to the CAT claim and deny the petition as to the asylum and withholding-of-removal claims.

**DISMISSED IN PART AND DENIED IN PART.**