[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 11, 2011
JOHN LEY
CLERK

_____

No. 10-11718
Non-Argument Calendar

_____

Agency No. A098-381-228

GLORIA JANETH QUINTERO QUINTERO,
EDUARDO ALFONSO GUTIERREZ OSORIO,
LAURA JAZMIN GUTIERREZ QUINTERO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 11, 2011)

Before BARKETT, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Gloria Janeth Quintero Quintero, a native and citizen of Colombia, petitions for review of the Board of Immigration Appeals's ("BIA") dismissal of her appeal from the Immigration Judge's ("IJ") order of removal, which denied her claim for asylum based on her treatment by the Revolutionary Armed Forces of Colombia ("FARC").[1] Quintero claims that the BIA erred in concluding that her experiences with the FARC did not rise to the level of past persecution. The Attorney General moves to dismiss the petition for lack of jurisdiction. We previously granted the Attorney General's motion in part as to petitioner Gloria Alejandra Gutierrez Quintero ("Alejandra"). For the reasons set forth below, we now deny the motion as to the remaining petitioners, and we deny Quintero's petition for review.

I.

Quintero, her husband, Eduardo Alfonso Gutierrez Osorio ("Gutierrez"), their older daughter, Alejandra, and their younger daughter, Laura Jazmin Gutierrez Quintero, arrived in the United States in January 2004 on visitor-for-pleasure visas. They were authorized to remain through July 2004.

In May 2004, Quintero applied for asylum on the basis of membership in a

---

[1] Quintero argues only that she established persecution and, thus, was eligible for asylum. She does not challenge the denials of withholding of removal under the Immigration and Nationality Act or relief under the Convention Against Torture. Accordingly, those issues are abandoned. *See Sepulveda v. U.S. Attorney Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (holding that an issue is abandoned if the initial brief fails to offer argument on it or makes only passing references to it).

particular social group. She asserted that she and her family were involved with political parties and that members of the FARC had harassed her and made death threats against her and her family. She stated that she was working at the Hospital de la Misericordia in 2000 as a radiologist technician. One night, a 16-year-old girl came to the hospital. The girl was the girlfriend of a guerilla leader. Some guerillas had attacked a farm in the department of Tolima and the girl was the only survivor. She arrived at the hospital in critical condition and died on the radiology table. Her companions blamed Quintero and threatened that Quintero's family would pay for her "negligence." They also indicated that they recognized Quintero from her and her husband's political activities.

Quintero further stated that, after the incident at the hospital, she began to receive threatening phone calls at work. She was burglarized twice, and people identifying themselves with the Frente de Tolima claimed responsibility. The pressure and stress led the family to relocate three months later to a village about 1.5 hours from Bogota. Quintero and Gutierrez ceased their political activities, but Quintero continued to commute to the hospital. A few months later, the guerillas found the family and the threats resumed. The family returned to Bogota in the hope of "hav[ing] a normal life again," but ultimately, they were forced to move twice more. The family had become increasingly worried and scared, the

3

girls were emotionally unstable, and they "didn't have a life anymore." Finally, the family came to the United States. Among the documentation supporting her asylum application was a note that read, "We have you and your daughters located. You will pay for the consequences, so call the police."

Quintero and her family were served with Notices to Appear ("NTA") in August 2004, charging them with having overstayed their visas in violation of Immigration and Nationality Act ("INA") § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B). They admitted the allegations and conceded removability.

At the asylum hearing, Quintero testified to the death of the patient in September 2000. Upon the patient's death, guerillas threatened Quintero, "saying that they had recognized [her] through [her] political interests."

Quintero testified that she worked with the Community Action Board, which served the needy, particularly in Tolima and Bogota. The Community Action Board was affiliated with the Liberal Party. She had been a member of the Board for approximately 15 years. Her work with the Board involved holding "talks" and "shops," administering vaccinations, teaching people to read, and educating people about their civic duties and responsibilities. She said that the guerillas did not indicate how they recognized her, but she speculated that they might have seen her performing her work for the Board.

Several days after the patient's death, individuals identifying themselves with the 21st Front called her at the hospital. They "let [her] know . . . not to forget what had happened to [the patient's] body and . . . that [she] had done it on purpose and that [she] worked for an imperialist government." They also said that the talks she gave in her work with the Board were "bothering them." From the time she began her work with the Board in 1988 until the patient's death in 2000, she had never had any problems with the FARC, but in this phone call, they expressed anger about both her work with the Board and the death of the patient. They went on to threaten her several more times over the course of three years. In those calls, they reminded Quintero of what had happened to the patient and told her that she or her family would pay for what she had done. The callers said that "they knew that [Quintero] had let [the patient] down on purpose" because Quintero disagreed with them politically, and that they would kill Quintero and her family.

Quintero and her family moved to Jovito in December 2000, though Quintero continued to commute to work. After several months, the guerillas began to call her at her new home. The family then moved back to Bogota, in a house on the opposite side of the city from their previous home. During this period, Quintero discontinued her work for the Board. The family stopped

5

answering the telephone and talking to strangers, and for a time, they "lived in peace." She resumed her work with the Board in October 2003. On January 6, 2004, while her daughters were staying with a friend in the coastal town of Barranquilla, Quintero received a phone call. The caller said that her daughters were doing well and having a good time at the coast, but that "they w[ould] return one of [the girls] back to [Quintero] the same way that [she] had [returned] that colleague of theirs." The caller also said that Quintero was considered a military objective due to her work with the Board, and "it was time that [she] paid." Quintero left Colombia on January 22, 2004.

Quintero testified that she was never kidnapped, detained, kicked, punched, or beaten. The first threatening phone call happened immediately after the girl's death, and the following calls always related to the girl's death. Quintero's counsel explained that being declared a "military objective" is a death threat.

The IJ denied asylum, withholding of removal under the INA, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), and he ordered Quintero and her family removed to Colombia. He found that Quintero's application and testimony were largely consistent with each other, except with respect to the reason for the FARC's interest in her. He concluded that the FARC had targeted Quintero on the

6

basis of her perceived "negligence" in the patient's death, not on the basis of her political activities. Consequently, she had not established a nexus to a protected ground. The IJ further found that, even if Quintero's testimony in that respect had been credible, the threats had not been so significant or severe as to rise to the level of past persecution. Finally, there was little evidence of an objective basis for fearing future harm, as the FARC had little interest in Quintero for the first 12 years of her involvement with the Board, and the patient's death had occurred several years before the instant proceedings.

Quintero appealed to the BIA. In September 2009, while the appeal remained pending, Alejandra applied for adjustment of status based on her marriage to a United States citizen. On October 1, 2009, Alejandra filed with the BIA a "Motion to Remand" her individual proceedings in light of her pending application and I-130 petition.

On March 18, 2010, the BIA dismissed the appeal as to all four family members. The BIA declined to address the question of Quintero's credibility, holding instead that, even if credible, her testimony did not establish past persecution or a well-founded fear of future persecution. Quintero had received numerous telephonic threats, but she was never threatened face-to-face or harmed, and the letter referencing her daughters did not declare her a military objective.

7

Under the circumstances, whatever the FARC's motivation, the cumulative threats did not rise to the level of harm required to establish past persecution. Additionally, Quintero had not established a well-founded fear of future persecution, as there was no evidence that the FARC had continued to seek her out or that it would remain interested in her more than six years after the most recent threat and almost ten years after the incident at the hospital.

Quintero timely petitioned for review of the BIA's decision. On August 27, 2010, the BIA entered the following "Amended Decision" *sua sponte*:

> To correct an error in our original decision, the Board's order of March 18, 2010, in this matter is hereby vacated and the proceedings are reinstated upon the Board's own motion. 8 C.F.R. § 1003.2(a). Through administrative error, we failed to examine the motion to remand pertaining only to respondent Gloria Alejandra Gutierrez Quintero . . . to allow her to seek adjustment of status based on her marriage to a United States citizen. The motion to remand for respondent Gloria Alejandra Gutierrez Quintero . . . was not considered in the Board's March 18, 2010, decision. Subsequent to . . . March 18, 2010, the Board has also received evidence from respondent Gloria Alejandra Gutierrez Quintero . . . confirming that the I-130 application filed on her behalf has been approved.
>
> A final order in the matter is hereby issued as of this date for respondents Gloria Janeth Quintero Quintero, . . . Eduardo Alfonso Gutierrez Osorio, . . . and Laura Jazmin Gutierrez Quintero, . . . incorporating by reference the text of the attached vacated order.
>
> With respect to respondent Gloria Alejandra Gutierrez Quintero, . . . the motion to remand is granted and the record will be remanded to allow her to apply for adjustment of status.
>
> ORDER: The appeal is dismissed.
> FURTHER ORDER: The motion to remand pertaining to

respondent Gloria Alejandra Gutierrez Quintero is granted and the record is remanded for further proceedings.

In December 2010, the Attorney General moved to dismiss the petition.

II.

We review questions of subject matter jurisdiction *de novo*. *Alvarado v. U.S. Attorney Gen.*, 610 F.3d 1311, 1314 (11th Cir. 2010). Our jurisdiction is limited to review of final orders of removal. 8 U.S.C. § 1252(a)(1); *Jaggernauth v. U.S. Attorney Gen.*, 432 F.3d 1346, 1350 (11th Cir. 2005). If events occur subsequent to the filing of the petition for review that deprive us of the ability to give the petitioner meaningful relief, the case is moot and must be dismissed. *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001).

In *Jaggernauth*, the BIA dismissed the alien's appeal from the IJ's removal order, upon which she simultaneously petitioned for review of the decision and moved the BIA to reconsider it. *Jaggernauth*, 432 F.3d at 1349-50. The BIA granted the motion to reconsider, but upheld and affirmed both the IJ's order and its original dismissal of the appeal, without changing the legal basis for its decision. *Id.* at 1350. On review, we rejected the argument that a grant of a motion to reconsider, coupled with an affirmance of the original removal order, rendered the original removal order non-final. *Id.* at 1351. The BIA's order on

9

reconsideration explicitly upheld the original order without changing its substance. *Id.* "[T]he BIA's intent was to leave the [original removal] order, as well as the reasoning underlying the order, intact and unmodified." *Id.* We further held, "'Once an issue is properly raised by a petition for review of the original decision, no purpose would be served by requiring the petitioner to raise the identical issue again in a petition to review the BIA's decision on the motion to reconsider.'" *Id.* at 1352 (quoting *Desta v. Ashcroft*, 329 F.3d 1179, 1184 (10th Cir. 2003)).

Here, the BIA's Amended Opinion was triggered by a *sua sponte* reconsideration of the March 18th order in light of the BIA's recognition that it had overlooked the material fact of Alejandra's Motion to Remand. *See* 8 C.F.R. § 1003.2(a), (b)(1). The BIA then granted Alejandra's Motion to Remand, without changing its decision or reasoning as to the other three petitioners. Thus, as to Quintero, Gutierrez, and Laura, the BIA's action closely resembled the "grant and affirmance" at issue in *Jaggernauth*. Although the BIA suggested that the entire March 18th order was vacated, it immediately reincorporated by reference the full text of that order as against Quintero, Gutierrez, and Laura, and its Amended Decision clearly shows its intent to reconsider the March 18th order only for the limited purpose of addressing Alejandra's overlooked Motion to Remand and

10

vacating her removal order. The BIA did not intend to alter its decision or reasoning in any way as to the other three petitioners. Under the circumstances, the substance and effect of the Amended Decision were to remand Alejandra's proceedings while leaving her family's removal orders and the reasoning underlying the affirmance of those orders "intact and unmodified." *See Jaggernauth*, 432 F.3d at 1351.

As Quintero properly raised her asylum-eligibility claim in the petition for review of the March 18th order, "no purpose would be served by requiring [her] to raise the identical issue again in a petition to review the BIA's decision on the [*sua sponte*] motion to reconsider." *See id.* at 1352 (quotation marks omitted). Accordingly, we deny the Attorney General's motion to dismiss the petition as to Quintero, Gutierrez, and Laura.

### III.

Where, as here, the BIA writes a separate opinion that does not adopt the IJ's opinion or rely upon its reasoning, we review only the BIA's opinion. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). "We will not reverse unless the record compels a contrary conclusion." *De Santamaria v. U.S. Attorney Gen.*, 525 F.3d 999, 1006 (11th Cir. 2008). Factual determinations are reviewed under the substantial evidence test, which requires us to "view the record evidence

11

in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (*en banc*). "We must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 1027 (quotation marks omitted).

"[P]ersecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation . . . ." *De Santamaria*, 525 F.3d at 1008 (quotation marks omitted). "[M]ere harassment does not amount to persecution." *Id.* (quotation marks omitted). In some situations, death threats in combination with assaults, kidnappings, or attempted attacks constitute persecution. *See id.* at 1008-10 (collecting cases and ruling similarly on petitioner's claim). Threatening phone calls that occur in isolation or are not clearly related to an attack, though, do not rise to the level of past persecution that would compel reversal of the BIA's contrary decision. *See Sepulveda*, 401 F.3d at 1231. Although we do not rigidly require physical injury, *De Santamaria*, 525 F.3d at 1008, "minor physical abuse and brief detentions do not amount to persecution," *Kazemzadeh v. U.S. Attorney Gen.*, 577 F.3d 1341, 1353 (11th Cir. 2009).

Here, Quintero's written statement indicated that she began to receive

threatening telephone calls at work following her patient's death. She was burglarized twice, and individuals identifying themselves with the Frente de Tolima claimed responsibility. Her family relocated, but the threats resumed. The family then relocated several more times. The statement did not describe the content or frequency of the threatening phone calls, and it did not suggest that she or anyone else was at home during the burglaries. Quintero also submitted a letter that said, "We have you and your daughters located. You will pay for the consequences, so call the police."

At the hearing, she testified that the first phone call she received at the hospital merely told her "not to forget what had happened" to her patient and accused her of letting the patient die on purpose. At some point, the callers began to threaten to kill Quintero and her family. She said that she received "several" of these calls over the course of three years. The callers began to contact her at home, upon which the family moved more than once, but they "lived in peace" after they stopped answering the phone or talking to strangers. She was never kidnapped, detained, or physically harmed, she did not indicate that she ever was confronted in person, and she eventually resumed her work with the Community Action Board. A few months after she had resumed her activities, a caller told her that she was a military objective, indicated that he or she knew the location of

Quintero's daughters, and threatened to kill one of the girls. Taken as a whole, the threats and the early burglaries, without more, do not compel the conclusion that Quintero's experiences rose to the level of past persecution. *Cf. Kazemzadeh*, 577 F.3d at 1353; *De Santamaria*, 525 F.3d at 1008-10; *Sepulveda*, 401 F.3d at 1231.

For the foregoing reasons, we deny the petition for review.

**MOTION TO DISMISS DENIED. PETITION FOR REVIEW DENIED.**